UNITED STATES of America

v.

Ronald J. PERHOLTZ, Appellant.

UNITED STATES of America

v.

Franklin W. JACKSON, Appellant.

UNITED STATES of America

v.

Gregory W. FLETCHER, Appellant.

Nos. 86–3032 to 86–3034.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 15, 1987.
Decided March 8, 1988.

Whitney Debevoise (appointed by this court), with whom Mark A. Kass, Washington, D.C. was on the brief, for appellant Jackson.

Steven Schaars, Springfield, Va., with whom Leigh Manasevit, Washington, D.C., was on the brief, for appellant Perholtz.

William L. Gardner, Washington, D.C., (appointed by this court), for appellant Fletcher.

Katherine A. Worthington, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Michael W. Farrell, Brian M. Murtagh, and Joseph B. Valder, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before BORK* and BUCKLEY, Circuit Judges, and EDWARD D. RE,** Chief Judge, U.S. Court of International Trade.

Opinion PER CURIAM.

* Judge Bork, a member of this panel at the time of argument, concurred in this opinion but resigned before its issuance.

## PER CURIAM:

A jury convicted appellants Perholtz and Jackson of one count of racketeering and thirteen counts of mail fraud in connection with Postal Service and Small Business Administration ("SBA") procurements. The jury convicted appellant Fletcher of ten counts of mail fraud in connection with the same SBA procurement. The jury also found forfeit certain property of Perholtz and Jackson related to their racketeering. Appellants challenge their convictions and the forfeitures on numerous grounds. We affirm in all respects.

### I. Background

In an appeal from a jury's criminal conviction, we recite the evidence presented at trial, as we must ourselves view it, in the light most favorable to the government. *See, e.g., United States v. Huber,* 603 F.2d 387, 391, 395 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980).

### A.

As a result of litigation, in 1978 the United States Postal Service initiated procurements to calculate the back pay due some ninety thousand of its workers (a task known as the FLSA Accounting Project) and also to introduce a new payroll system prospectively (the Payroll Redesign Project). At this time, John Gentile, who later testified for the government and repaid $40,000 received as bribes in exchange for immunity from prosecution, was Assistant Postmaster General for Finance. Appellant Perholtz was General Manager for Accounting for the Postal Service until December 1977, when he resigned and formed his own computer systems development firm, ATL, Inc. Appellant Jackson was Manager of the Postal Service's Systems Redesign Branch during this time.

According to Gentile, he and Perholtz had agreed that Perholtz upon his departure from the Postal Service would enter

** Sitting by designation pursuant to 28 U.S.C. § 293(a) (1982).

into a consulting contract with a computer company to prepare a proposal for the as-yet unannounced FLSA Accounting Project procurement. Gentile would favor selection of that company's proposal inside the Postal Service in exchange for ten percent of the profits Perholtz would receive upon the proposal's acceptance. At Perholtz's request, Gentile introduced Perholtz to an acquaintance at Systems Development Corporation, with which ATL, Perholtz's corporation, thereafter contracted to prepare the FLSA proposal. Gentile also sent a memorandum, under his signature but written in fact by Perholtz (who was then no longer a Postal Service employee), to senior management urging the need for an FLSA procurement. When the Postal Service subsequently initiated the procurement, Gentile "pushed for" the Systems Development proposal, as Perholtz by telephone frequently urged him to do. Jackson, who according to Gentile was largely a message-carrier between Perholtz and Gentile on the FLSA procurement, also exhorted Gentile to "push it." But because certain costs in the Systems Development proposal were too high, the Postal Service awarded the contract to another firm. Although Perholtz received $10,000 from Systems Development for his bid preparation work, he received no profits under his consulting contract since the proposal was rejected.

### B.

In its first phase, the Postal Service's Payroll Redesign Project was to develop a prototype computerized payroll system, the Automated Time and Attendance Procedures project ("ATAP"). Gentile testified that in early 1978 Perholtz suggested to Gentile and Jackson that the three of them "wire" the ATAP procurement. Perholtz would join with a computer hardware firm to submit an ATAP proposal, for which he would prepare software responsive to the needs of ATAP in exchange for a share of the profits to be generated by the proposal. Jackson, as manager of the Payroll Redesign Project within the Postal Service, would prepare technical aspects of the procurement and require a short response time from bidders. At the same time, Gentile

would inform Perholtz in advance of the project's technical requirements. Gentile also agreed to support the Perholtz proposal before senior Postal Service management. If the Postal Service accepted the proposal, the three would share Perholtz's contractual royalties.

Perholtz contacted John Cox of General Scientific Corporation, a manufacturer's representative for Essex Engineering, to propose a consulting agreement with Essex, in which Essex would provide the hardware and Perholtz the software for a bid on ATAP. At a meeting with Essex representatives, Perholtz stated that he had "contacts" at the Postal Service whom he referred to as "my people." ATL (Perholtz's corporation) entered into a consulting agreement with Essex in May 1978 for software to be used in its ATAP proposal. Perholtz had essentially completed preparation of this software by August 25, 1978, when the Postal Service first requested proposals for the ATAP project. The Postal Service stated that this initial, informal request would be followed by a formal solicitation of bids and, if the government desired, by demonstrations of competitive proposals. The Postal Service also stated that it would not award a contract on the basis of the initial request. Jackson oversaw preparation of the request's technical specifications, which represented a "close fit" with the system of hardware and software already completed by Essex and Perholtz.

In subsequent demonstrations by seven vendors, the Essex submission met ninety-five percent of the requirements. Moreover, it was the only one to provide a demonstration of software as well as hardware. Jackson, who had headed the panel before whom the submissions were demonstrated, thereafter prepared an evaluation of the demonstrations, concurred in by the panel, recommending that Essex receive a sole-source (noncompetitive) contract for ATAP, a result not previously contemplated and one inconsistent with the wholly informational purpose of an informal request. Upon Perholtz's suggestion, Jackson also prepared a study to illustrate the

urgency of quickly going forward with ATAP. This study was a key element hastening the contract's award.

When, in January 1979, the Postal Service's procurement department recommended that ATAP be awarded through a competitive procurement, Perholtz, Jackson, and Gentile met and drafted a responsive memorandum, ultimately sent under Gentile's signature, that recommended a sole-source award to Essex. The Postal Service entered into a letter contract with Essex in March 1979 on a sole-source basis.[1]

Postal Service employees required training to operate the new ATAP system. Perholtz asked Gentile if he knew of a firm that could provide this training; Gentile referred him to the Metropolitan Education and Training Corporation ("Metcor"), owned by James Muldoon. According to Gentile, Perholtz said that he, Gentile, and Jackson would share equally in the commission Perholtz obtained from Metcor. Perholtz then told Muldoon that he, Perholtz, could obtain the ATAP training work from Essex in return for a ten percent commission. In March 1979, Muldoon signed a marketing agreement with ATL, backdated at Perholtz's request to November 1978. Muldoon, employees of Essex, and employees of the Postal Service, including Jackson, attended a meeting to decide whether the Postal Service or an outside contractor should handle the ATAP training. According to Muldoon, Jackson's statement favoring an outside contractor turned the meeting decisively in Muldoon's favor. Metcor, Muldoon's company, with the approval of the Postal Service, thereafter received a subcontract from Essex for the ATAP training.

Perholtz received more than $187,000 under his contract with Essex, and $9,500 under the agreement with Metcor. Jackson and Gentile each received $27,000, and Jackson also received an interest in a Florida condominium, for their participation in the ATAP arrangements.

### C.

To monitor the loans and grants it had made nationwide, the Small Business Administration ("SBA") decided to link its many local offices in a data communications system with the central computer in its main office. In November 1979, SBA awarded a one-year sole-source contract for development and implementation of such a system to International Business Services, Inc. ("IBS"). Appellant Fletcher had joined IBS as vice president for operations in April 1979. Upon Fletcher's recommendation, IBS hired Jackson in May 1979. Jackson subsequently became project manager for development of the SBA data communications system, reporting directly to Fletcher, who retained ultimate responsibility for the project. IBS also retained Perholtz as a consultant on the SBA project.

IBS had the authority to enter into subcontracts with other firms, subject to SBA approval, to perform the SBA contract. This case involves four such arrangements.

The first subcontract, for a free-standing printer in each SBA local office, was between IBS and Printer Systems Corporation ("Printer Systems"). Perholtz told Printer Systems' president, Ashby Reid, that he had had a relationship with IBS in the past, that he had learned that IBS was the SBA contractor, and that he could obtain for Printer Systems the stand-alone printer subcontract from IBS. Printer Systems thereafter submitted a proposal to IBS, and in meetings with SBA officials on the proposal, Perholtz acted as Printer Systems' sales representative. IBS and Printer Systems formed a subcontract for the printers in November 1979.

According to Gentile and Muldoon, in meetings attended by Muldoon, Jackson, and Fletcher, Perholtz proposed to use the proceeds of the Printer Systems subcontract to pay Gentile and Jackson the amounts owed them for their roles in the ATAP scheme. In accord with this plan, Gentile used his wife's fabric company to

---

**1.** The mailings of Essex invoices for payment between Postal Service headquarters in Washington and the Postal Data Center in New York served as the mailings incident to the mail fraud offenses and the racketeering acts concerning the ATAP procurement.

enter into a marketing agreement with Printer Systems. Printer Systems would pay the company (and ultimately charge SBA) unearned commissions on its sales of printers to IBS. Gentile would then split the payments with Jackson.[2] Neither Gentile, his wife, nor his wife's company did anything to further the sales from Printer Systems to IBS.

The second subcontract involved cathode ray tube terminals ("CRTs") and printers joined to the terminals. To obtain these items, Perholtz again turned to John Cox of General Scientific Corporation. Perholtz told Cox that he and Conley Dillon, a long-time acquaintance, were forming a marketing corporation, and that General Scientific should pay Dillon any commissions from printer sales to IBS. Thereafter, Perholtz asked Dillon, a full-time employee of the Department of Labor, to sign a marketing agreement and receive commission payments from General Scientific, in return for which Dillon would retain six percent of the commissions and Perholtz would receive the rest. (Perholtz said that a conflict of interest prevented him from taking the commissions directly.) Dillon then signed a marketing agreement with General Scientific, backdated before General Scientific's first contact with the SBA; Cox signed this agreement without ever meeting Dillon.

Although IBS did purchase one demonstrator printer, the SBA ultimately rejected the printer, while General Scientific decided not to pursue the CRT sales. Therefore, in December 1979, Perholtz told Dillon that the General Scientific deal was off. He proposed instead an arrangement with Printer Systems Leasing Corporation ("Printer Leasing"), an affiliate of Printer Systems, the firm Perholtz had previously used in the procurement of stand-alone printers. Dillon then signed a marketing agreement with Printer Leasing parallel to the General Scientific agreement; again, Dillon never made any effort to market the equipment.

When Perholtz presented the marketing agreement to Printer Leasing, its counsel objected since Dillon had never done anything for Printer Leasing and indeed had never even met anyone at Printer Leasing. Perholtz replied that he owed Dillon a debt that the commissions from Printer Leasing would satisfy. Perholtz stated further that he controlled whether Printer Leasing received business from IBS, and that the only way it would receive the business was to execute the marketing agreement with Dillon. Counsel also requested of Perholtz, but never received, a waiver from IBS of any objection to Perholtz's receipt of commissions from Printer Leasing. Ashby Reid, Printer Leasing's president, nonetheless signed the agreement.[3]

Printer Leasing ultimately leased the CRTs and sold the associated printers to IBS for the SBA data communications system; Dillon received unearned commissions on these sales of about $137,000.[4]

The third subcontract required by the SBA system was a front-end processor in each local office to control its data communications with the central office. In late 1979, Ecotran–Chi ("CHI") agreed to lease such processors to IBS. But CHI, finding that it could not finance a leasing arrangement, sought in February 1980 to sell its processors to a third party that would lease them to IBS. Upon Perholtz's suggestion,

---

2. Under the agreement between Gentile's wife's company and Printer Systems, commissions were due upon invoicing to IBS. Perholtz told Gentile that Jackson would know of the invoices' receipt and thus know when Printer Systems owed them the fake commissions. Upon receipt of an invoice, Jackson would contact Gentile to confirm that Gentile had received payment from Printer Systems. Jackson then would pick up his share of the money from Gentile in the form of a check payable to Computer Consultants International, a corporation apparently controlled by Perholtz. Under this arrangement, Gentile wrote checks totalling some $27,000.

3. Although the United States sought to bring charges against Reid for his role in the ATAP and SBA procurements, he was not a defendant in the case below, and the information filed against him was voluntarily dismissed.

4. Printer Leasing paid most of this money in the form of checks to Computer Consultants, an entity also used to funnel ATAP bribes to Gentile and Jackson. *See supra* n. 2.

Printer Systems bought the processors and leased them to IBS. As the sale was moving toward completion, Printer Systems entered into joint venture and profit distribution agreements with ATL, Perholtz's company. The agreements granted ATL (which had put up no capital) half ownership of the CHI processors and half the profits from their lease in exchange for ATL's promise not to compete with Printer Systems for the SBA leases and its assistance negotiating the lease agreements between SBA and Printer Systems. Printer Systems paid ATL approximately $300,000 in profits derived from the leases.[5]

The fourth subcontract required by the SBA's data communications system concerned installation and maintenance. On the recommendation of Printer Systems' Reid, Perholtz contacted Lloyd Root, the owner of Computer Systems Support Corporation ("CSSC"), which had previously maintained Printer Systems' equipment. In a meeting to discuss the subcontract, Perholtz said that he could make sure that CSSC would receive the contract, and in January 1980 it did. Soon after the SBA approved the installation and maintenance contract between CSSC and IBS, CSSC assigned the contract to Remote Computer Services, Inc., a corporation formed for the purpose and owned in equal shares by Reid, Root, and Perholtz (while he was still an IBS consultant). The assignment was effected without notice to SBA, and despite the assignment CSSC did all maintenance and installation work. SBA paid CSSC $809,000, and CSSC transferred $347,000 to Remote. Remote in turn disbursed approximately $151,000 to Perholtz, $143,000 to Reid, and $9,500 to Root (the owner of CSSC).[6]

### D.

Computer Consultants International, Inc. ("Computer Consultants") was the conduit through which bogus commissions arising from the SBA's data communications project reached Jackson and Fletcher via Dillon.[7] According to Dillon, Perholtz told him to turn Computer Consultants over to Fletcher and Jackson to pay them for their roles in the SBA project.[8] At a subsequent meeting, Fletcher told Dillon to convert Computer Consultants' funds into cash or gold. Dillon complied and gave Fletcher and Jackson about $83,000.[9]

In September 1980, Jackson left IBS and returned to the Postal Service, where he resumed management of the Payroll Redesign Project, now in a phase called "STARS." Fletcher subsequently left IBS as well and formed a corporation called Computer Contemporaries, Inc. ("Compucon"), which entered into a consulting arrangement with Stanford Research Institute, a bidder on the STARS project. Perholtz had a contractual relationship with

---

5. In late 1982, Perholtz had Dillon sign yet another marketing agreement, this time with ATL, backdated to before the CHI–Printer Systems sale. Dillon was to assist ATL in obtaining financing for the sale; not only did Dillon do nothing to this end, but Printer Systems, not ATL, was charged with lining up financing. Dillon nonetheless received $25,000 from ATL under this agreement, which he testified was designed to move funds into the Computer Consultants' bank account for Perholtz's purchase of a boat called "The Mistress."

6. Perholtz also was paid $84,000 by CSSC for preparing its invoices to IBS, a task otherwise performed by a secretary.
 In addition, Perholtz persuaded Dillon to sign a backdated sham marketing agreement with Remote. Dillon again did nothing, and in due course a check for some $48,000 issued to Computer Consultants.

7. Checks mailed by the government to IBS and Printer Systems were the predicate mailings for the SBA mail fraud counts and together constituted a single predicate racketeering act for the racketeering count.

8. At Perholtz's request, Dillon had previously used Computer Consultants' funds to rent a Florida condominium owned by Fletcher and Jackson. Perholtz had told Muldoon that he and Jackson were to buy this condominium with their proceeds from ATAP; Fletcher later acquired his interest in the condominium from ATL, Perholtz's company. Dillon paid about $20,000 in rent to Jackson and Fletcher although he never used the condominium and only visited it after the government initiated the investigation in this case.

9. In 1983, after the government had subpoenaed Computer Consultants' records, Perholtz returned to Dillon the cash and gold Dillon had given Fletcher and Jackson.

Honeywell, a competing bidder on the project. The STARS project was ultimately cancelled without award.

Fletcher also participated in a bid by Booz, Allen and Hamilton for a Postal Service contract in a project called "PRISM," of which Jackson was co-director. Fletcher persuaded Dillon to execute a backdated "service agreement" between Compucon and Computer Consultants.[10] Dillon again did nothing pursuant to the agreement, but received $135,000 from Compucon.[11]

In 1983, after the government had subpoenaed the records of Computer Contemporaries, Perholtz wrote a long document called "Issues," subsequently referred to as the "script," and told Dillon to absorb its contents. This document discusses extensively everything that Dillon was supposed to have done under the various agreements he had signed. Dillon knew little of what was in the document; prior to his plea agreement, he attempted to memorize it.

### E.

The fifteen-count indictment under which this case went to trial was returned in August 1985. Count I charged Perholtz and Jackson, under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) (1982), with conspiracy to enrich an "enterprise," as defined in RICO, *id.* § 1961(4), through

bribery, kickbacks, and mail fraud spanning all the Postal Service and SBA procurements discussed above.[12] The government moved to dismiss this count at the close of its case.

Count II charged Perholtz and Jackson with participation in the affairs of the same enterprise alleged in count I, through a pattern of racketeering comprised of thirty-seven racketeering acts. Racketeering act one charged Perholtz and Jackson with agreement to commit bribery in the Postal Service's FLSA project. Racketeering act two charged them with bribery in the ATAP project. Acts three through thirty-six charged various instances of mail fraud in ATAP. Act thirty-seven charged mail fraud through multiple mailings in the SBA data communications procurement. Count II sought forfeiture from Perholtz and Jackson of assets related to their racketeering under 18 U.S.C. § 1963(a) (1982).

Counts III, IV, and V charged Perholtz and Jackson with mail fraud in connection with the ATAP procurement. Counts VI through XV charged Perholtz, Jackson, Fletcher, Root, and Dillon with mail fraud in connection with the SBA's data communications procurement.[13]

### F.

In a pretrial hearing before Judge Gerhard A. Gesell, Perholtz requested a sepa-

10. Perholtz originally obtained the incorporation papers for Computer Consultants from Fletcher, and the contents of those papers were substantially identical to Compucon's later-filed articles of incorporation.

Perholtz in 1983 persuaded an acquaintance to acquire Compucon from Fletcher with funds loaned by Computer Consultants, which eventually itself acquired Compucon.

11. Fletcher also teamed up with another successful bidder, Coopers & Lybrand, in a Postal Service project called "FIRM," of which Jackson was in charge.

12. The indictment charged an enterprise as follows:

Defendant RONALD J. PERHOLTZ, defendant FRANKLIN W. JACKSON, John L. Gentile (an unindicted co-conspirator), Gregory W. Fletcher, Ashby R. Reid, Jr., Conley H. Dillon, Jr., Lloyd E. Root, Jr., ATL Corporation, IBS, Printer Systems Corporation ..., Printer Sys-

tems Leasing Corporation ..., Computer Systems Support Corporation ..., Remote Computer Services Corp., Computer Consultants International, Inc., Professional Design Services, Fairlington Properties, Southern Properties, and Computer Contemporaries, Inc., constituted an enterprise, as that term is defined by Title 18, United States Code, Section 1961(4) to wit, a group of individuals, partnerships, and corporations associated in fact to unjustly enrich themselves from the proceeds of government contracts and subcontracts, for computer services and equipment, which had been and would be obtained by means of bribery, fraud, and circumvention of government contracting procedures designed to secure for the United States government the benefits of competition.

13. Before trial, Dillon pleaded guilty to subscribing to a false federal income tax return and agreed to testify for the prosecution; the charges against him were dropped.

rate evidentiary proceeding for the forfeiture count, to be convened before the jury only if the jury found Perholtz guilty under RICO.[14] The court denied the motion.[15]

During trial, the government questioned an official of Printer Systems concerning statements by Perholtz about the desirability of incorporating an entity in the Cayman Islands, and cross-examined defendant Jackson as to whether he or Fletcher had established a bank account there. In the government's rebuttal at closing argument, the prosecutor suggested that ill-gotten gains from the SBA scheme had ended up in the Caymans.

### G.

The jury found Perholtz, Jackson, and Fletcher guilty on all counts but acquitted Root. On count II, the jury found racketeering acts two through thirty-seven as charged, but exonerated Perholtz and Jackson of act number one, bribery in the FLSA procurement. The jury also declared forfeit most of the items named in the indictment, including all of Perholtz's stock in ATL and all bank accounts in ATL's name. Perholtz, Jackson, and Fletcher received prison terms of ten, seven, and four years, respectively.

## II. DISCUSSION

### A. Plain Error Rule

Many of appellants' claims of error were raised for the first time on appeal. Ordinarily, a party waives his right to appeal a trial court's ruling if he fails to object below. Federal Rule of Criminal Procedure 52(b), however, provides: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In a recent discussion of the rule, the Supreme Court stated:

> The plain-error doctrine ... tempers the blow of a rigid application of the contemporaneous-objection requirement.

The Rule [52(b)] authorizes the Courts of Appeals to correct only "particularly egregious errors," those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." In other words, the plain-error exception to the contemporaneous objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." Any unwarranted extension of this exacting definition of plain error would skew the Rule's "careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed."

*United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (footnote and citations omitted). Applying this restrictive standard of review to the issues discussed below, we conclude that appellants have not established plain error.

### B. The Indictment Properly Charged an Association-in-Fact

Appellants claim that the indictment improperly charged an association-in-fact composed of individuals, corporations, and partnerships. As none of the appellants objected at trial to the wording of the indictment, we review the claim under the plain-error standard. *Jackson v. United States*, 359 F.2d 260, 265 (D.C.Cir.) (plain-error rule applies to defects in indictment), *cert. denied*, 385 U.S. 877, 87 S.Ct. 157, 17 L.Ed.2d 104 (1966).

Under RICO, " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (1982). Appellants claim that the government must choose between charging an individual, partnership, or corporation, on the one hand, and an association-in-fact on the other hand. Appellants argue that the indictment in this case was

---

**14.** Jackson, the other RICO defendant, preferred a single evidentiary proceeding regarding guilt and forfeiture.

**15.** The court instructed the jury not to consider forfeiture unless, in their deliberations, they previously had found them guilty of the RICO count.

fatally flawed because it charged individuals, corporations, and partnerships associated in fact. The relevant portion of the indictment is reproduced *supra* at 351 n. 12.

We are unpersuaded. The statute defines "enterprise" as *including* the various entities specified; the list of entities is not meant to be exhaustive. "There is no restriction upon the associations embraced by the definition...." *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). On the contrary, Congress has instructed us to construe RICO "liberally ... to effectuate its remedial purposes." Pub.L. No. 91-452, § 904(a), 84 Stat. 922, 947 (1970) (*reprinted in note following* 18 U.S.C. § 1961), *quoted in Turkette*, 452 U.S. at 587, 101 S.Ct. at 2530; *accord Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985). Appellants' restrictive interpretation of the definition of enterprise would contravene this principle of statutory construction.

Appellants' reading of section 1961(4) would lead to the bizarre result that only criminals who failed to form corporate shells to aid their illicit schemes could be reached by RICO. This interpretation hardly accords with Congress' remedial purposes: to design RICO as a weapon against the sophisticated racketeer as well as (and perhaps more than) the artless. *See United States v. Huber*, 603 F.2d 387, 394 (2d Cir.1979), *cert. denied*, 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980); *see also McCullough v. Suter*, 757 F.2d 142, 143–44 (7th Cir.1985) ("we do not suppose that 'Murder Inc.' was really a corporation; and we cannot believe that Congress would have wanted gangsters [associated in fact] to be able to escape the clutches of section 1962(c) just by avoiding the corporate form").

■ We therefore follow those courts that have held that individuals, corporations, and other entities may constitute an association-in-fact. *See United States v. Thevis*, 665 F.2d 616, 625–26 (5th Cir. Unit B), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982); *see also*

*United States v. Navarro–Ordas*, 770 F.2d 959, 969 n. 19 (11th Cir.1985) (group of corporations may constitute association-in-fact), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1200, 89 L.Ed.2d 313 (1986); *McCullough*, 757 F.2d at 143–44 (sole proprietorship and employees may constitute association-in-fact); *United States v. Aimone*, 715 F.2d 822, 828 (3d Cir.1983) (individuals and corporations may constitute association-in-fact), *cert. denied*, 468 U.S. 1217, 104 S.Ct. 3585, 82 L.Ed.2d 883 (1984); *Bunker Ramo Corp. v. United Business Forms, Inc.*, 713 F.2d 1272, 1285 (7th Cir.1983) ("enterprise" includes all enumerated entities and any combination of them); *Huber*, 603 F.2d at 394 (group of corporations may constitute association-in-fact).

■ Appellant Perholtz makes the further claim that the indictment named him both as a part of the enterprise and as a defendant, in contravention of the requirement that the "person" be separate from the "enterprise" with which he is associated under 18 U.S.C. § 1962(c) (1982). *See Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 839 F.2d 782, 789–92 (D.C.Cir.1988). We have no occasion to consider the separateness requirement, however, because the indictment does not run afoul of this principle. The indictment charged that Perholtz, along with other individuals and corporations, formed an enterprise, i.e., an association-in-fact. The indictment further alleged that Perholtz participated in the conduct of the enterprise by his various actions in furtherance of its common objectives. This case thus is significantly different from the cases relied upon by Perholtz, *e.g., Bennett v. United States Trust Co.*, 770 F.2d 308, 314–15 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986), holding that a corporation cannot be both the enterprise and the defendant under section 1962(c) because it cannot associate with itself. The indictment did not allege that Perholtz associated with himself, but that he associated with others. That is the very meaning of an *association* -in-fact. *Cf. United States v. Benny*, 786 F.2d 1410, 1415–16 (9th Cir.) (defendant may be

charged as member of association-in-fact or as participant in conduct of own sole proprietorship provided it has employees), *cert. denied,* —— U.S. ——, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986); *McCullough,* 757 F.2d at 143–44 (same). Nor were Perholtz and the other members of the enterprise merely "subdivisions, agents, or members of the defendant organization." *Yellow Bus,* 839 F.2d at 791. The individual defendants joined with each other and formed the corporations to further their common objectives. This relationship of individuals and corporations is precisely what section 1962(c) was designed to attack.

## C. Appellants Have Failed to Establish a Variance Between Proof and Indictment

■ To sustain a RICO conviction, as charged in this case, the government must prove beyond a reasonable doubt that an enterprise existed as charged in the indictment; that the enterprise affected interstate commerce; that the defendant was associated with the enterprise; and that the defendant knowingly participated, even indirectly, in the conduct of the enterprise through a pattern of racketeering. *See Martin–Trigona v. Smith,* 712 F.2d 1421, 1426 n. 6 (D.C.Cir.1983); 18 U.S.C. § 1962(c) (1982). Defendants Perholtz and Jackson contest the trial judge's ruling that the evidence is sufficient to establish the existence of a single racketeering enterprise as charged in the indictment. The defendants assert that the evidence, viewed most favorably to the government's position, reveals either two or three separate enterprises. Hence, it is urged that this alleged variance between indictment and proof requires reversal of the RICO convictions.

Title 18 U.S.C. § 1961(4) (1982) provides that an " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." We conclude *infra* at 362 that the enterprise is established by common purpose among the participants, organization, and continuity. The evidence here was sufficient for the jury to conclude that these elements were established with respect to a single enterprise.

The participants in the enterprise were either individuals who sought financial gain from the award of government contracts, or were corporations, controlled as a practical matter by those individuals, who were instrumental in executing the charged schemes. The goal of obtaining the proceeds of government contracts for computer services and equipment through the perversion of the bidding process motivated the members of the associational enterprise at all relevant times. *See United States v. Lemm,* 680 F.2d 1193, 1199 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983).

The elements of continuity of structure and personnel were evident despite some changes in personnel between schemes, and despite the fact that every participant did not play an identical role in each scheme. *See United States v. Tillett,* 763 F.2d 628, 631–32 (4th Cir.1985); *United States v. Cagnina,* 697 F.2d 915, 921–22 (11th Cir.), *cert. denied,* 464 U.S. 856, 104 S.Ct. 175, 78 L.Ed.2d 157 (1983); *see also United States v. Riccobene,* 709 F.2d 214, 223 (3d Cir.) (the continuity requirement "does not mean that individuals cannot leave the group or that new members cannot join at a later time"), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983). Perholtz exhibited a leadership role throughout the period that the enterprise was functioning, although his nominal position was that of a consultant. Jackson, both as a Postal Service official and as an executive of IBS, used his position to direct contracts to entities with which Perholtz was associated. *Cf. United States v. Bledsoe,* 674 F.2d 647, 666 (8th Cir.) (appearance of disjunctive ventures and refusal of certain participants to cooperate with each other militates against finding of continuity of personnel), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed. 608 (1982), *noted in Lemm,* 680 F.2d at 1200.

The evidence revealed that Perholtz suggested to Gentile and Jackson that they "wire" the ATAP proposal. In his meeting with Essex officials, Perholtz's reference to

Postal Service employees as "my people" strongly suggested that he might exercise substantial influence over the award of contracts. Perholtz was largely responsible for a memo sent over Gentile's signature which suggested that Essex be awarded a sole-source contract. In meetings attended by Jackson, among others, it was Perholtz who suggested using the proceeds of the Printer Systems contracts to pay Jackson and Gentile for their roles in the ATAP scheme. Perholtz stated to counsel for Printer Leasing that it was he who determined whether the firm would receive business from IBS. Perholtz also instructed Dillon as to how Fletcher and Jackson would be paid for their roles in the SBA project. Subsequently, when the government's investigation jeopardized the continuance of the enterprise's illegal activities, it was Perholtz who drafted the script for Dillon to memorize.

With regard to Jackson, the evidence demonstrated that he used his position at the Postal Service to direct the ATAP contract to Essex (with which Perholtz, through ATL, had contracted to be a consultant). For the SBA scheme, Jackson was hired by IBS at the suggestion of Fletcher, and later became project manager for development of the SBA data communications systems.

█ Perholtz became a consultant to IBS. Fake commissions from the Printer Systems subcontract on the SBA communications project were funnelled through Computer Consultants, another entity controlled by Perholtz, in order to pay Jackson and Gentile for their roles in the ATAP scheme. Jackson later returned to the Postal Service to assume a management role in the PRISM and FIRM projects, and in the STARS project, a later phase of the Payroll Redesign Project. In sum, the existence of a continuing core of personnel motivated by a common interest is sufficient to constitute the association-in-fact enterprise. See United States v. Errico, 635 F.2d 152, 156 (2d Cir.1980) (a group of bettors linked to a group of jockeys through the defendant constitute an enterprise where all were acting with the purpose of "fixing" horse races), cert denied, 453 U.S. 911, 101 S.Ct. 3142, 69 L.Ed.2d 994 (1981).

In light of the foregoing, we agree with the trial judge's statement that

[a] reasonable juror could conclude from the evidence that the members of the enterprise were all linked together by a network of contracts, transactions and pay-offs orchestrated and organized by defendant Perholtz with the knowing and willful participation and assistance of others. The interlocking nature of the schemes and the overlapping nature of the wrongdoing provides sufficient evidence for the jury to conclude that this was a single enterprise that started with the alleged conspiracy of Perholtz, Jackson and Gentile and added or dropped members over time as the scheme became more complex and expansive.

We are also mindful of the jury's inquiry into the existence of the enterprise, and the deference to be accorded to the results of that inquiry. United States v. Hewes, 729 F.2d 1302, 1311 (11th Cir.1984), cert. denied, 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1984); Riccobene, 709 F.2d at 222. Our task is to determine whether there is substantial evidence, viewed most favorably to the prosecution, to support the verdict. Burks v. United States, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978). We need not parse the enterprise's numerous and wide-ranging activities in an effort to decide whether we subjectively consider those activities to be more properly consistent with a finding of one, two, or three distinct enterprises.

Even if appellants could establish a variance between proof and indictment, that variance must be prejudicial to warrant the reversal of their convictions. See Dunn v. United States, 442 U.S. 100, 105–06, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979); Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935); United States v. Mangieri, 694 F.2d 1270, 1278 (D.C.Cir.1982). Prejudice arises in cases in which a defendant is deprived of notice of the charges against him, when he is inadequately protected against reprosecution, or

when he is deprived of the right to be tried only on charges presented in an indictment returned by a grand jury. *Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960); *United States v. Lemire*, 720 F.2d 1327, 1344 (D.C.Cir.1983), *cert. denied*, 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984); *Gaither v. United States*, 413 F.2d 1061, 1071–72 (D.C.Cir. 1969). Prejudice has not been shown in this case, and we conclude that there is substantial evidence to support the jury's decision and that there was no variance between proof and indictment.

## D. Evidentiary Issues

### 1. *The Trial Court Properly Admitted Evidence of the Script*

Defendants Perholtz and Jackson contend that the admission into evidence of the "script" prepared for Dillon by Perholtz was error. The document, they argue, (1) does not qualify as a co-conspirator statement pursuant to Federal Rule of Evidence 801(d)(2)(E),[16] (2) amounts to proof of uncharged crimes of obstructing the grand jury and suborning perjury, and (3) is far more prejudicial than probative pursuant to Federal Rule of Evidence 403. At trial, only counsel for Root, a codefendant who subsequently was acquitted, objected to the introduction of the script *under Rule 403*. As no objection was made under Rule 801(d)(2)(E), and the trial court's inquiry differs significantly under these two rules, the plain-error standard applies to appellants' hearsay claims.

■ The Supreme Court has "affirm[ed] the validity of the use of co-conspirator statements" in trials conducted in federal courts. *United States v. Inadi*, 475 U.S. 387, 400, 106 S.Ct. 1121, 1129, 89 L.Ed.2d 390 (1986); *see also Bourjaily v. United States*, — U.S. —, 107 S.Ct. 2775, 2783, 97 L.Ed.2d 144 (1987) (emphasizing that the co-conspirator exception is "steeped in our jurisprudence"). "Fed.R.Evid. 801(d)(2)(E) embodies the longstanding doctrine that when two or more individuals are acting in

concert toward a common goal, the out-of-court statements of one are not hearsay and are admissible against the others, if made in furtherance of the common goal." *United States v. Weisz*, 718 F.2d 413, 433 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1027, 1034, 104 S.Ct. 1285, 1305, 79 L.Ed.2d 688, 704 (1984). The statements of joint venturers may fall within the scope of the Rule, and there is no requirement that a conspiracy be formally charged in the indictment. Fed.R.Evid. 801 Senate Judiciary Committee notes; *United States v. Jackson*, 627 F.2d 1198, 1216 (D.C.Cir.1980).

■ In order to admit co-conspirator statements, the trial judge must determine that a conspiracy existed, that the co-conspirator and the defendant against whom the statement is offered were members of the conspiracy, and that the statements were made in furtherance of the conspiracy. *United States v. Gantt*, 617 F.2d 831, 844 (D.C.Cir.1980). The defendants do not specifically challenge the existence of the first two elements. Rather, they rely on *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949), and its progeny, for the proposition that statements made "during a subsequent period when the conspirators were engaged in nothing more than concealment of the criminal enterprise," are inadmissible as they are not in furtherance of the conspiracy. *Dutton v. Evans*, 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970) (plurality opinion) (citing *Lutwak v. United States*, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), and *Krulewitch v. United States*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949)). This, however, does not "mean that acts of concealment can never have significance in furthering a criminal conspiracy." *Grunewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957). The *Grunewald* decision indicates that "acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy" may be considered to be in furtherance of the conspir-

---

**16.** Federal Rule of Evidence 801(d)(2)(E) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is

... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

acy within the meaning of the co-conspirator hearsay exemption. *Id.* (emphasis in original).

On the facts presented, the trial judge was amply justified in concluding that the script was prepared while the "conspiracy [was] still alleged to be continuing, and actively continuing." For example, the scheme relative to the STARS project was continuing, and the parties had not received payments from the PRISM and FIRM contracts. The main purpose of the scheme, to collect government funds from improperly awarded contracts and then distribute the proceeds among the conspirators, had not been fully achieved at the time of the creation of the script. In short, Perholtz's attempts "to influence witnesses were not acts of concealment related only to a past objective. They were parts of continuing activity that was essential to and therefore in furtherance of the survival of an ongoing operation." *United States v. Del Valle*, 587 F.2d 699, 704 (5th Cir.), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2822, 61 L.Ed.2d 274 (1979). As noted by this court in *United States v. Haldeman*, 559 F.2d 31 (D.C.Cir.1976) (en banc), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977), in explaining its holding that narratives of past events may constitute statements "in furtherance of" a conspiracy:

> As the threads of the cover-up began to unravel, it became increasingly important to review what had taken place in order to identify and shore up the loose ends. It became critical for the conspirators to try to ensure that any story they wished to present would not ring false and that any action they were considering would not backfire, a strategy whose success required total familiarity with the facts.

*Haldeman*, 559 F.2d at 110–11 (footnote omitted). In this case, furthering the conspiracy depended upon Dillon's familiarity with the "facts" as explained by Perholtz in the script. For this additional reason, the script is not hearsay because it is not being "offered in evidence to prove the truth of the matter[s] asserted." Fed.R. Evid. 801(c); *Anderson v. United States*, 417 U.S. 211, 219–20, 94 S.Ct. 2253, 2260, 41 L.Ed.2d 20 (1974).

In *United States v. Bruner*, 657 F.2d 1278 (D.C.Cir.1981), the court rejected a hearsay challenge to evidence introduced during a prosecution for conspiracy to obtain narcotics from physicians for illegal resale. The government introduced into evidence prescriptions containing patients' names and addresses, as well as the names and dosages of the substances to be dispensed. The court upheld admission of the prescriptions noting that the prosecutor did not attempt to prove that the information contained in the prescriptions was correct. The government merely wanted to show that these prescriptions were used to obtain narcotics. *Bruner*, 657 F.2d at 1284. Similarly, in this case, the government did not intend to show that any particular item contained in the script was true. To the contrary, the purpose was to show that the information in the document was false; to wit, that Dillon knew little about the services supposedly rendered pursuant to various agreements he had made. *See Anderson*, 417 U.S. at 220 & n. 9, 94 S.Ct. at 2260 & n. 9.

Having concluded that evidence of the script is not objectionable on hearsay grounds, the court must now consider whether it should have been excluded under Federal Rule of Evidence 404 [17] and 403. [18] *See, e.g., United States v. Foskey*, 636 F.2d 517, 523 (D.C.Cir.1980). With re-

---

**17.** Rule 404 provides in material part:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**18.** Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

spect to Rule 404, despite defense counsel's suggestions to the contrary, the evidence was not offered to prove that the defendants are persons of "bad character and thus predisposed to commit the crime[s] for which [they are] on trial." *Foskey*, 636 F.2d at 523; *see also* Fed.R.Evid. 404 advisory committee notes (bad acts not admissible "to prove character as a basis for suggesting the inference that conduct on a particular occasion was in conformity with it"). Rule 404 "countenances admission of 'bad acts' evidence that is relevant to any material issue in the case except to show the likelihood that, having once fallen into sin, a second slip is likely." *United States v. Lavelle*, 751 F.2d 1266, 1275 n. 11 (D.C. Cir.) (quoting *United States v. James*, 555 F.2d 992, 999 (D.C.Cir.1977)), *cert. denied*, 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985). The evidence is highly probative of efforts to further an ongoing scheme to defraud and demonstrate conscious awareness of guilt on the part of the defendants. *See United States v. Hammond*, 781 F.2d 1536, 1540 (11th Cir.1986); *United States v. Bongard*, 713 F.2d 419, 420–21 (8th Cir. 1983); *United States v. Turner*, 485 F.2d 976, 985 (D.C.Cir.1973) (remarks of Leventhal, J.); *United States v. Cirillo*, 468 F.2d 1233, 1240 (2d Cir.1972), *cert. denied*, 410 U.S. 989, 93 S.Ct. 1501, 36 L.Ed.2d 188 (1973).

■ With respect to Federal Rule of Evidence 403, it is true that, although evidence is relevant, it may still be excluded under the rule if its probative value is substantially outweighed by unfair prejudice. *United States v. Payne*, 805 F.2d 1062, 1066 (D.C.Cir.1986); *United States v. Hernandez*, 780 F.2d 113, 118 (D.C.Cir. 1986). The balancing of probative value versus prejudicial effect required by Rule 403 is, of course, committed to the discretion of the trial judge. *Carter v. District of Columbia*, 795 F.2d 116, 126 (D.C.Cir. 1986); *see also United States v. Wright*, 489 F.2d 1181, 1186 (D.C.Cir.1973) (trial court's discretion not to be disturbed "save for grave abuse"). It has been stated that, at least in close cases, "under Rule 403 the balance is tilted toward admission of evidence." *Hernandez*, 780 F.2d at 118 (cit-

ing *United States v. Moore*, 732 F.2d 983, 989 (D.C.Cir.1984)).

The creation of the script occurred as the scheme to defraud was continuing. *See United States v. Sutton*, 801 F.2d 1346, 1362 (D.C.Cir.1986); *Lavelle*, 751 F.2d at 1277; *cf. Foskey*, 636 F.2d at 525 ("bad act" occurred over two years prior to offense charged). This type of evidence did not require the jury "to pursue a complex chain of inferences arising from circumstantial evidence." *Moore*, 732 F.2d at 989. Since Dillon's testimony regarding the creation of the script was clearly a question for the jury and not this court, the jury could properly infer that the defendants were conscious of their roles in the scheme. *Moore*, 732 F.2d at 989 n. 45; *Lavelle*, 751 F.2d at 1277 n. 14. Furthermore, the script evidence is closely tied to the crimes charged and only indirectly suggests distinct offenses. *Payne*, 805 F.2d at 1066 n. 5; *United States v. McDowell*, 762 F.2d 1072, 1075 n. 3 (D.C.Cir.1985).

It should also be noted that this case does not involve past acts having little temporal or logical connection to the crimes at issue. *Cf. Hernandez*, 780 F.2d at 118 (defendant's indecipherable shouting at an earlier fight inadmissible as evidence of motive to possess unregistered gun); *Foskey*, 636 F.2d at 524 (defendant's bad act consisted of accompanying an individual carrying concealed narcotics). The prosecutor did not infect the case with innuendo tainting the character of the defendants, *cf. United States v. Shelton*, 628 F.2d 54, 58 (D.C.Cir.1980); *Frank v. United States*, 262 F.2d 695, 696–97 (D.C.Cir.1958), and did not present copious details of sordid past acts. *Cf. United States v. James*, 555 F.2d 992, 1000 (D.C.Cir.1977). Nor is it a case where evidence is presented in such a manner as to highlight its inflammatory qualities and de-emphasize its potentially probative aspects. *Cf. Carter*, 795 F.2d at 128 (long excerpts of newspaper articles containing inflammatory matter read into record). Indeed, the trial judge, in an effort to minimize any prejudicial effect, ordered counsel to refrain from making any reference to the subornation of perjury or

to the obstruction of justice. He also charged the jurors that evidence of fabrication "does not create an impression of guilt," and, although they might consider it as indicative of consciousness of guilt, they were not required to do so.

In sum, the evidence tended to reveal Perholtz's "management role in the conspiracy—to show his particular relationship to the conspiracy and to the other conspirators." *Bruner*, 657 F.2d at 1293. While the evidence was "damning ... its introduction was [not] error." *Cirillo*, 468 F.2d at 1240. Hence, there is no ground upon which to upset the ruling of the trial court on the admissibility of the script.

### 2. *Evidence of Other Schemes*

■ Although the government moved to dismiss count I of the indictment at the end of its case, *see supra* at 351, the district judge did not instruct the jury to ignore the evidence introduced by the government in connection with that count. Appellants did not request such an instruction, but argue to us that the failure of the court to so instruct the jury *sua sponte* was reversible error. We review this claim under the plain-error standard, which applies with special force to these facts. Appellants' failure to object below served their tactical objectives. When the government moved to dismiss count I on the condition that the evidence introduced on that count be submitted to the jury as probative of the rest of its case, appellants weighed the relative value of a dismissal of count I versus the effect of the evidence. Appellants chose the dismissal, but now seek to exclude the evidence as well.

As noted *supra* at 354, the government was obliged to prove that the association-in-fact had a continuity of structure and personnel in order to establish the existence of an enterprise. The evidence relating to the STARS, PRISM, and FIRM schemes (charged in count I) was probative of continuity; it tended to establish that many of the same players associated in a similar manner and for similar purposes. In particular, Perholtz was the leader and Jackson was the insider in the STARS,

PRISM, and FIRM schemes as well as the ATAP and earlier SBA schemes. As the evidence tended to prove the continuity of the association-in-fact, no cautionary instruction was necessary. *Cf. United States v. Celaya–Garcia*, 583 F.2d 210, 212 (5th Cir.1978) (evidence of transaction involving defendant occurring two months after transaction charged in indictment properly admitted without cautionary instruction because it demonstrated continuing plan of conspiracy), *cert. denied*, 440 U.S. 926, 99 S.Ct. 1259, 59 L.Ed.2d 481 (1979). Certainly, the failure to give a cautionary instruction was not plain error.

Therefore, we do not reach the government's claim that the evidence was admissible under Federal Rule of Evidence 404(b) as showing common scheme, pattern, plan, or intent. Brief for the United States at 57.

### E. The Prosecutor's Closing Remarks Do Not Warrant Reversal of the Convictions

Defendants Fletcher and Jackson also assert that the prosecutor's questioning of Jackson on cross-examination, and the reference in his rebuttal closing argument to the possible secretion of funds in the Grand Cayman Islands ("Islands") "had a material, critical impact on the jury's consideration of [the defendants'] guilt." This assertion requires an examination of the relevant facts to determine whether the prosecutor's remarks constitute "plain error."

Mr. Simpson, the Vice–President of Printer Systems, testified for the government that Perholtz had suggested to Reid (President of Printer Systems) that a corporation be formed in the Islands for tax purposes, and that, if cash was needed, one could go there and "stuff [his] pockets." On direct examination, Jackson testified about trips taken to the Islands with Fletcher to investigate investment opportunities in real estate. On cross-examination, he admitted being present in banks on the Islands. He denied, however, having any bank account in the Islands, and did not know whether Fletcher had opened an account. After the government had complet-

ed its case-in-chief, it received documents from the Islands revealing that Fletcher had opened accounts in the name of Compucon, Ltd. The government moved to reopen its case to present this evidence. The trial judge denied this motion noting that to reopen might result in an unwarranted extension of an already lengthy trial. In particular, Fletcher would be entitled to show that these accounts had no connection with the charged scheme, and instead represented an attempt to conceal assets from his wife in connection with his pending divorce. The trial judge also observed that the evidence "does not go directly to any essential issue in the case but is presented for the purpose of drawing inferences as to the source of the funds and motives for concealing it in foreign accounts." Finally, the judge stated that the "dates and activity in the account reflected in Government Ex. 700B (id.) strongly suggests the principal inference the United States urged at oral argument is very dubious and perhaps wholly inaccurate."

The trial judge ordered that no reference be made during closing arguments to the documents, and that the defendants not "chid[e] the government for not having made good on representations they were going to make about the Cayman Islands other than the evidence that is in evidence." Jackson could argue, however, that there was no connection between himself and any money in the Islands. Fletcher's counsel informed the trial judge that he intended to argue that there is no indication as to the whereabouts of the monies received from Dillon. In response, the trial judge stated: "It would seem to me you make your arguments and able counsel for the government can respond." In closing, Jackson argued that there was no evidence of a "payoff" from Fletcher, and that there was no evidence to show where the monies allegedly received by Fletcher from Dillon went. Hence, he suggested that the jury may infer that Fletcher never received these monies. In his rebuttal closing, the prosecutor stated:

And there has been all sorts of claims by [Fletcher's counsel] of why can't the government find the $40,000 or the $80,-000, etc., etc. and ladies and gentlemen, I'm going to deal with that very quickly. I suggest to you the reason for that is that, Mr. Jackson told you, they are on an airplane to the Cayman Islands a couple of days later. You know from Mr. Simpson's testimony about the purpose people put money in the Cayman Islands: The difficulty of law enforcement authorities being able to find out about it. And I suggest to you that is the answer as to where the money is, or went.

The question presented is whether the prosecutor's remarks constitute error, and if so, given the lack of objection at trial, whether they amount to "plain error."

 In view of the broad discretion of the trial judge in regulating cross-examination, no error was committed in the cross-examination of Jackson. In light of Dillon's prior testimony on payments to Jackson and Fletcher, Jackson's direct testimony about trips to the Islands to invest in real estate, his statement concerning his presence with Fletcher in banks on the Islands, and the prosecutor's information about Fletcher's account, the questions were based on a "well reasoned suspicion," and do not amount to an "improbable flight of fancy." *United States v. Pugh,* 436 F.2d 222, 225 (D.C.Cir.1970); *see also United States v. Bent,* 707 F.2d 1190, 1194 (11th Cir.1983) (where defendant implied that prior trips into the United States were made for legitimate purpose, it was proper to cross-examine concerning alleged past involvement in drug smuggling), *cert. denied,* 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed. 2d 557 (1984).

 Turning to the issue of the closing remarks, it has been established that a prosecutor should not make "statements of fact to the jury not supported by proper evidence introduced during trial." *Gaither v. United States,* 413 F.2d 1061, 1079 (D.C. Cir.1969). The prosecutor's remarks were error to the extent that they overstated Simpson's testimony as to the reasons bank accounts in the Islands are opened, and to the extent that they suggested funds were hidden in the Islands. This, however, does

not terminate the inquiry, since a reviewing court must decide whether the improper remarks caused substantial prejudice to the defendant, *United States v. Monaghan,* 741 F.2d 1434, 1443 (D.C.Cir.1984), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985); *United States v. Kim,* 595 F.2d 755, 768 (D.C.Cir.1979), in light of the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the improper remarks. *Monaghan,* 741 F.2d at 1443; *Gaither,* 413 F.2d at 1079. Evaluating the claim of plain error "against the entire record," *Young,* 470 U.S. at 16, 105 S.Ct. at 1046, we find that the error in this case did not "undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *Id.*

The offending statements were confined to the summation, *United States v. Modica,* 663 F.2d 1173, 1181 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982), and consisted only of "two remarks made by the prosecutor during the course of his rather lengthy closing argument to the jury." *Donnelly v. DeChristoforo,* 416 U.S. 637, 640, 94 S.Ct. 1868, 1870, 40 L.Ed.2d 431 (1974); *see also United States v. Jordan,* 810 F.2d 262, 265 (D.C.Cir.) (improper remark consisted of one phrase out of 215–line opening statement), *cert. denied,* —— U.S. ——, 107 S.Ct. 1963, 95 L.Ed.2d 535 (1987). The remarks were not the product of an improper motive on the part of the prosecutor to excite the prejudices of the jury, *Monaghan,* 741 F.2d at 1442 n. 33, and seemed to be a response to defense counsel's suggestions that there was no trace of the payments made by Dillon. In addition, we agree with the trial judge that the remarks were not directed to the central issues in the case: the participation of Perholtz and Jackson in racketeering acts including bribery and mail fraud in connection with the Postal Service's ATAP and FLSA procurements and the Small Business Administration's procurements, and the participation of all appellants in various acts of mail fraud in connection with the SBA's communications procurements.

Although the defendants did not object to the prosecutor's remarks, and did not request curative instructions, the trial court, nevertheless, did charge the jury that arguments of counsel are not evidence. The Supreme Court has noted that such an instruction may be considered in evaluating the extent to which the fairness of a trial has been affected. *See Darden v. Wainwright,* 477 U.S. 168, 182, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); *see also United States v. Powell,* 469 U.S. 57, 66, 105 S.Ct. 471, 477, 83 L.Ed.2d 461 (1984) (jurors expected to obey oath to follow law as charged). Courts have often emphasized the curative power of a trial court's instructions. *See United States v. Polizzi,* 801 F.2d 1543, 1558 (9th Cir.1986); *United States v. Rojas,* 731 F.2d 707, 710 (11th Cir.1984); *United States v. Jackson,* 627 F.2d 1198, 1213 (D.C.Cir.1980) (citing *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 367, 83 S.Ct. 448, 463, 9 L.Ed.2d 357 (1963)); *Kim,* 595 F.2d at 768; *United States v. Handly,* 591 F.2d 1125, 1131 (5th Cir.1979). *But cf. United States v. Daniels,* 770 F.2d 1111, 1118 (D.C.Cir.1985) (quoting *Krulewitch v. United States,* 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790 (1949) (Jackson, J., concurring)); *Modica,* 663 F.2d at 1182; *Gaither,* 413 F.2d at 1079. Indeed, one member of this court has flatly declared: "it is the law, pure and simple, that jury instructions can sufficiently protect a defendant's interest in being free from undue prejudice." *Daniels,* 770 F.2d at 1120 (Starr, J., concurring) (citing *Spencer v. Texas,* 385 U.S. 554, 561, 87 S.Ct. 648, 652, 17 L.Ed.2d 606 (1967)).

The conclusion that this case does not present the "exceptional circumstance[ ]," *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 239, 60 S.Ct. 811, 851, 84 L.Ed. 1129 (1940), of a "trial infected with error so 'plain' [that] the trial judge and prosecutor were derelict in countenancing it," *United States v. Frady,* 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982), is bolstered by the existence of a strong case against the defendants. Suffice it to state that the evidence demonstrated that Jackson accepted a bribe in connection with his substantial efforts to

direct the award of the ATAP contract to Essex, that he also received payments for both his roles in the ATAP and SBA procurements via Computer Consultants International, and that he received cash, gold, and "rent" payments on a Florida condominium. As for Fletcher, the evidence demonstrated, *inter alia*, that he was aware of the use of Computer Consultants as a conduit for the payment of kickbacks, and that he, like Jackson, received payments for his role in the SBA procurements scheme in the form of cash, gold, and "rent" payments.

From its examination of the record, the court has concluded that the prosecutor's remarks at issue did not cause substantial prejudice to the defendants, and that, under the circumstances of this case, any possible prejudice was cured by the trial judge's instructions that arguments of counsel are not evidence. Hence, there was no "plain error."

### F. Instructions on Enterprise Distinct from Pattern

Appellants argue that the district court plainly erred in failing to instruct the jury that the enterprise must be separate from the pattern of racketeering activity. As appellants apparently did not raise this claim below, we will not reverse unless the error is plain. *See, e.g., United States v. DeBango,* 780 F.2d 81, 84 (D.C.Cir.1986); *United States v. Lemire,* 720 F.2d 1327, 1343 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2678, 81 L.Ed.2d 874 (1984). As the record is ambiguous on whether appellants made this claim to the district court, *see United States v. Perholtz,* 657 F.Supp. 603 (D.D.C.1986), J.A. at 103, we emphasize that we would reject appellants' argument even if they did adequately preserve it.

Appellants primarily rely on *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), which held that RICO encompasses both legitimate and illegitimate enterprises. One of the reasons given by the appellate court that reached the opposite conclusion was that inclusion of illegitimate enterprises would eviscerate the distinction between the enterprise and the pattern of racketeering. The Supreme Court rejected this argument:

> In order to secure a conviction under RICO, the Government must prove both the existence of an "enterprise" and the connected "pattern of racketeering activity." The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute. 18 U.S.C. § 1961(1) (1976 ed., Supp. III). The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While *the proof used to establish these separate elements may* in particular cases *coalesce,* proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an *entity separate and apart from the pattern* of activity in which it engages.

452 U.S. at 583, 101 S.Ct. at 2528–29 (emphasis added). As we read this passage, the government is required to prove that the associates are bound together by some form of organization so that they function as a continuing unit, and thus constitute an "enterprise." Although organization is not *necessarily* established by proof of a pattern of racketeering activity, the existence of the enterprise may be inferred from proof of the pattern.

■ The enterprise is established by (1) a common purpose among the participants, (2) organization, and (3) continuity. The second element—"organization" or "structure"—is the most difficult to show. Appellants urge us to adopt the view of some circuits that the structure must be proven by evidence other than that of the pattern of racketeering:

> [An association-in-fact] encompass[es] only an association having an ascertain-

able structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts constituting the "pattern of racketeering activity."

*United States v. Anderson,* 626 F.2d 1358, 1372 (8th Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). *See also United States v. Neapolitan,* 791 F.2d 489, 500 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 422, 93 L.Ed.2d 371 (1986) (quoting *Anderson* ); *United States v. Tillett,* 763 F.2d 628, 631 (4th Cir.1985); *United States v. Riccobene,* 709 F.2d 214, 223–24 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *United States v. Lemm,* 680 F.2d 1193, 1198 (8th Cir.1982), *cert. denied,* 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983).

Most of these cases, *e.g., Lemm,* 680 F.2d at 1198, interpret the following language from *Turkette:* "The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." 452 U.S. at 583, 101 S.Ct. at 2529. To the extent these courts have held that the enterprise is not *equivalent* to the pattern of racketeering, we are in accord. The same group of individuals who repeatedly commit predicate offenses do not necessarily comprise an enterprise. An extra ingredient is required: organization. To the extent, however, these cases suggest that the organization cannot be inferred from the pattern (or even more, that the organization cannot exist unless it does something other than commit predicate acts), we cannot agree. *Turkette* specifically recognizes that the proof of the enterprise may "coalesce" with the proof of the pattern, i.e., that the different conclusions may be inferred from proof of the same predicate acts. 452 U.S. at 583, 101 S.Ct. at 2529. The more extreme conclusion, that the enterprise must have non-criminal manifestations, was rejected by the precise holding of *Turkette.*

Those courts imposing a strict separateness requirement appear to be concerned that RICO could be expanded to encompass even a "sporadic and temporary criminal alliance." *Lemm,* 680 F.2d at 1201. They need not be, however, if proper attention is given to the organization and continuity requirements for the enterprise, on the one hand, and the "continuity plus relationship" requirement for the pattern of racketeering, on the other hand. *See Sedima,* 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting S.Rep. No. 617, 91st Cong., 1st Sess. 158 (1969)).

 We therefore follow those courts that have held that the government satisfies its burden if it proves the existence of the enterprise and of the pattern, and refuse to require the government to prove each by separate evidence. *See United States v. Mazzei,* 700 F.2d 85, 89 (2d Cir.), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983); *see also United States v. Williams,* 809 F.2d 1072, 1093–94, *modified in different part,* 828 F.2d 1 (5th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 228, 98 L.Ed.2d 187 (1987); *United States v. Qaoud,* 777 F.2d 1105, 1115 (6th Cir. 1985) (citing *Mazzei* ), *cert. denied,* 475 U.S. 1098, 106 S.Ct. 1499, 89 L.Ed.2d 899 (1986); *United States v. Hewes,* 729 F.2d 1302, 1310–11 (11th Cir.1984), *cert. denied,* 469 U.S. 1110, 105 S.Ct. 790, 83 L.Ed.2d 783 (1984); *United States v. DeRosa,* 670 F.2d 889, 895–96 (9th Cir.), *cert. denied,* 459 U.S. 993, 103 S.Ct. 353, 74 L.Ed.2d 391 (1982).

 Judge Gesell instructed the jury as follows:

An enterprise may be a group of people, partnerships and corporations that become associated together in an organized continuing unit for a common purpose of engaging in a legal or illegal course of conduct.

The indictment charges that the enterprise in this case was a group of individuals, partnerships and corporations associated for the common purpose of unjustly enriching themselves from the proceeds of government contracts and subcontracts. . . .

. . . .

It is not necessary that the enterprise, if it existed, have any particular or formal structure but it must have sufficient organization that its members function and operated together in a coordinated manner in order to carry out the common purpose alleged.

J.A. at 266–67. This instruction properly defined the elements of an association-in-fact. The instruction required the jury to find (1) common purpose, (2) organization, and (3) continuity.

G. Instruction on Membership of Enterprise

■ Appellants argue that Judge Gesell erroneously instructed the jury as follows:

The membership need not include every one of the entities I have listed as long as you find that it was substantially the same as the enterprise described. The membership of the enterprise may change over time but the enterprise must have a continuous organization, purpose and core of personnel that remain essentially unchanged during the period charged in the indictment.

J.A. at 267. Appellant Jackson argues that this instruction "erroneously relieved the Government of its duty to conform the proof to the indictment"; in particular, that it discharged the government from the burden of proving that the enterprise existed during the STARS, PRISM, and FIRM projects. Brief for Jackson at 39. Appellants did not object to this instruction below, and we therefore review under the plain-error standard. *See supra* at 362.

With respect to Jackson's first objection, substantial identity between proof and indictment is sufficient; minor variances are permitted. *See supra* at 355–56.

The enterprise is proven by common purpose, organization, and continuity. Therefore, it is not essential that each and every person named in the indictment be proven to be a part of the enterprise. The enterprise may exist even if its membership changes over time, *e.g., Hewes,* 729 F.2d at 1316–17, or if certain defendants are found by the jury not to have been members at any time.

The evidence concerning STARS, PRISM, and FIRM is another matter. We do not perceive how the instruction just quoted directly relieved the government of its burden of proving the existence of the enterprise while these schemes were in progress. On the contrary, the evidence relating to STARS, PRISM, and FIRM tended to establish this very fact—the continuity of the enterprise. *See supra* at 355. As the government had dismissed count I, it was not obliged to prove beyond a reasonable doubt that the enterprise existed while STARS, PRISM, and FIRM were ongoing. The government was only required to show that this evidence was probative of an element it was required to prove: the existence of a continuous enterprise.

H. Mail Fraud

1. *Statute of Limitations*

To sustain the convictions for violation of the mail fraud statute, 18 U.S.C. § 1341 (1982),[19] this court must determine that the jury, properly charged, could find that the defendants caused the mails to be used for the purpose of executing a scheme to defraud. *See United States v. Sampson,* 371 U.S. 75, 76, 83 S.Ct. 173, 174, 9 L.Ed.2d 136 (1962); *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Counts III through V of the indictment, *inter alia,* charge defendants Perholtz and Jackson, together with Gentile, with causing the mailing of documents, in September

19. Section 1341 provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

and December of 1980, which authorized the payment of funds to Essex in connection with a bid-rigging scheme involving ATAP. Defendant Perholtz contends that the five-year statute of limitations specified in 18 U.S.C. § 3282 (1982) [20] bars his prosecution for mail fraud. He argues that the limitations period is calculated from the date that the offense charged is complete, namely, the date of consummation of the agreement among the parties to pay bribes in return for the awarding of the ATAP contracts. Since, in his view, the undisputed evidence adduced at trial reveals that this agreement occurred prior to August 6, 1980, exactly five years prior to the date the indictment was returned, the mail fraud prosecution is jurisdictionally precluded.

■■■ Since mailings that clearly furthered the scheme to defraud occurred within five years of the date of the indictment, the mail fraud prosecution is not time barred. *See United States v. Brewer*, 807 F.2d 895, 897–98 (11th Cir.) (citing *United States v. Georgalis*, 631 F.2d 1199, 1204–06 (5th Cir. Unit B 1980)), *cert. denied*, — U.S. —, 107 S.Ct. 1909, 95 L.Ed.2d 515 (1987); *see also United States v. A–A–A Elec. Co.*, 788 F.2d 242, 244–45 (4th Cir.1986) (in prosecution for bid-rigging conspiracy in violation of Sherman Act, section 3282 limitations period does not begin to run until final payments received and payoffs distributed among co-conspirators). In *United States v. Lane*, 474 U.S. 438, 451–53, 106 S.Ct. 725, 733–34, 88 L.Ed.2d 814 (1986), the Supreme Court affirmed section 1341 convictions involving arson as part of a scheme to defraud insurance companies. In a statement that is applicable here, the Court held that a "jury could properly find the scheme, at the earliest, was not completed until receipt of the last payment." *Lane*, 474 U.S. at 452, 106 S.Ct. 733. Here, also, the jury could properly find that the instant scheme had not been completed prior to the mailing, from Washington, D.C. to New York City, of the authorization of payment for Essex.

Absent a plan to "lull the victims into a false sense of security," *United States v. Maze*, 414 U.S. 395, 403, 94 S.Ct. 645, 650, 38 L.Ed.2d 603 (1974), mailings occurring after a scheme has "reached fruition," *Kann v. United States*, 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944), generally are not deemed to be in furtherance of the scheme. The case at bar, however, must be distinguished from those cases in which the mailings occurred after the party perpetrating the fraud has received the goods or services sought. *See Maze*, 414 U.S. at 402, 94 S.Ct. at 1189 (fraud completed when defendant used stolen credit card to obtain food and lodging); *Parr v. United States*, 363 U.S. 370, 393, 80 S.Ct. 1171, 1184, 4 L.Ed.2d 1277 (1960) (perpetrators of fraud obtained products and services prior to the billing by the merchants); *Kann*, · 323 U.S. at 95, 65 S.Ct. at 151 (conviction under materially identical predecessor to section 1341 reversed where defendants had received fraudulently obtained monies prior to the mailings). Here, the use of the mails was a highly probable means by which Essex, and ultimately the defendants, would "acquire dominion," *Maze*, 414 U.S. at 401, 94 S.Ct. at 649, over the funds that represented the fruits of the plan to defraud. The mailing alleged in the indictment, therefore, was "incident to an essential part of [a] scheme," *Pereira*, 347 U.S. at 8, 74 S.Ct. at 363, involving the bribery of Postal Service officials, which was designed to collect monies by depriving the Postal Service of the financial benefits of honest procurements. On the facts presented, the mail fraud prosecution was timely commenced, and was not barred.

### 2. *The Mail Fraud Statute Proscribes Appellants' Conduct*

In the wake of the decision in *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), appellants contend that the conduct for which they were prosecuted is not encompassed by section

---

**20.** Section 3282 provides:

Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

1341. We reject appellants' argument and affirm all the mail fraud convictions.

In *McNally*, state officers required an insurance agency, as a condition of remaining the state's insurance agent, to "kickback" to entities controlled by those officers a portion of the commissions received from insurance companies doing business with the state. *McNally*, 107 S.Ct. at 2877. The indictment, *inter alia*, charged the defendants with participation in a scheme to defraud the citizens of the state of their right to honest and impartial government by virtue of the failure of the state officers to disclose the fact of their financial gain to other persons in state government whose actions could have been affected by the disclosure. *Id.* at 2882 n. 9. The Court reversed the mail fraud convictions, holding that section 1341 is limited to the protection of property rights and does not protect the "intangible right of the citizenry to good government." *Id.* at 2879. The Court noted that there was no charge that the state itself was defrauded of any property or that it was deprived of control over the expenditure of its funds. *Id.* at 2882. Furthermore, despite a charge in the indictment that the defendants had obtained property by means of false representations to the insurance agent, the jury was not required to make such a finding. *Id.* Absent a charge that state law prohibited profiteering by a state officer acting in an official capacity, or that state law required disclosure of such profiteering, the Court was unwilling to conclude that such activity defrauded the state and, therefore, that it is proscribed by federal law. *Id.* at 2882 n. 9.

For the reasons stated in our opinion concerning appellants' motions for release pending appeal, *United States v. Perholtz*, 836 F.2d 554, 558–60 (D.C.Cir.1988), we conclude that *McNally* does not require reversal of appellants' convictions in connection with the SBA scheme. We further conclude that the ATAP convictions also must be affirmed.

We base our conclusion concerning the ATAP scheme on *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). There, the Court upheld the convictions for mail and wire fraud of a Wall Street Journal ("Journal") reporter and others who traded stock in anticipation of the content of the Journal's "Heard on the Street" column. Although *McNally* had foreclosed prosecutions based on "intangible rights," it did not limit mail fraud to the deprivation of tangible *property*. The Journal had a property interest in its confidential business information: the timing and content of its column. 108 S.Ct. at 320. It was immaterial that the appellants had not interfered with the Journal's use of the information; the Journal owned the information, and it had the exclusive right to decide how to use it. *Id.* at 321. As the reporter obtained the information in the course of his employment, he was bound not to use it in a manner not authorized by the Journal:

> "a person who acquires special knowledge or information by virtue of a confidential or fiduciary relationship with another is not free to exploit that knowledge or information for his own personal benefit but must account to his principal for any profits derived therefrom."

*Id.* (quoting *Diamond v. Oreamuno*, 24 N.Y.2d 494, 497, 301 N.Y.S.2d 78, 248 N.E. 2d 910 (1969)).

 In this case, Jackson had confidential information concerning the design specifications that the Postal Service would require for the ATAP project. He acquired this information in the course of his employment and was not entitled to use it except in the manner directed by the information's owner (the government). Jackson's theft of property consisted of his appropriation of confidential information belonging to his employer.

Without deciding whether a government employee's unauthorized use of confidential information always would constitute a mail fraud violation, we conclude that this case is governed by *Carpenter*. The Postal Service was acting in its propriety capacity in undertaking ATAP. It sought to acquire a system for the lowest possible price and used a competitive bidding process to this end. The integrity of competitive bidding,

however, depends on all potential bidders receiving the same information at the same time. By appropriating the confidential information concerning the ATAP specifications and leaking it to Perholtz, Jackson skewed the bidding process and directly impinged upon the government's economic interests.

Although this case was not presented to the jury under *Carpenter's* theft of confidential business information rationale, we have little difficulty affirming on this basis. The instructions required the jury to find an enterprise whose purpose was to enrich itself unjustly "from the proceeds of government contracts and sub-contracts for computer services and equipment which had been and would be obtained by means of bribery, fraud and *circumvention of government contracting procedures.*" J.A. at 266 (emphasis added). Thus, the factual predicate for the jury's verdict necessarily implies that it found that Jackson stole confidential information in violation of the mail fraud statute as interpreted in *Carpenter.* Cf. *United States v. Jacobs,* 475 F.2d 270, 283 (2d Cir.) (upholding conviction on alternate basis because jury necessarily found every element required to support conviction), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973).

## I. The Forfeiture Verdict Should Not Be Reversed

■ Defendant Perholtz argues that separate proceedings are constitutionally required to determine guilt and to determine which assets are subject to forfeiture. In effect, he contends that the only way that he could defend against the possible forfeiture of a particular asset was to concede guilt by discussing the origin and ownership of that asset. Perholtz has cited no authority for the proposition that the proceedings in question were violative of due process, and the court holds that the trial judge's decision not to bifurcate the proceedings was within the proper exercise of his discretion.

Prior to trial, Perholtz requested separate proceedings although appellant Jackson sought a unitary proceeding. The trial judge denied Perholtz's request, but instructed the jurors that they should not consider the forfeiture question unless they first found the defendant guilty of the RICO offenses. This instruction was specifically repeated as to both Perholtz and Jackson. Perholtz apparently offered no objection to this instruction while the charge was formulated or after it was delivered.

The Supreme Court has held, albeit in the context of a capital case, that a unitary proceeding does not violate the right to due process. *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971), *vacated in part on other grounds,* 408 U.S. 941–42, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972). The Court concluded that the "policies of the privilege against compelled self-incrimination are not offended when a defendant in a capital case yields to the pressure to testify on the issue of punishment at the risk of damaging his case on guilt." *Id.* at 217, 91 S.Ct. at 1472. There is no requirement that a defendant be permitted "to speak to the jury free from any adverse consequences on the issue of guilt." *Id.* at 220, 91 S.Ct. at 1474. Since "[f]orfeiture under RICO is an in personam penalty designed as part of the punishment for the criminal offense committed," *United States v. Kravitz,* 738 F.2d 102, 106 (3d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985); *United States v. Huber,* 603 F.2d 387, 396 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980), and the Supreme Court has recognized that the same fundamental issue is involved in all sentencing proceedings, both capital and noncapital, see *Spaziano v. Florida,* 468 U.S. 447, 459, 104 S.Ct. 3154, 3161, 82 L.Ed.2d 340 (1984), we cannot agree with appellants' assertion that the Constitution requires bifurcated proceedings.

No showing has been made that Perholtz suffered prejudice as a result of the trial judge's decision not to bifurcate the proceedings. The trial judge properly employed the special verdict procedure re-

quired by Federal Rule of Criminal Procedure 31(e).[21] His instructions made clear the sequential nature of the inquiry into the questions of guilt and forfeiture. Moreover, we note that the jury did not vote to forfeit all the property listed on the special verdict form. Admittedly, the order decreeing a unitary proceeding does not reveal the trial judge's reasoning. The trial judge, however, could properly determine that, by allowing presentation of often related evidence on guilt and punishment at the same time, protracted proceedings would not become even lengthier, thereby serving the salutary purpose of promoting the efficient use of judicial resources.

We are aware of *United States v. Cauble*, 706 F.2d 1322, 1348 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984), in which the court stated that "the forfeiture issue should be withheld from [the jurors] until after they have returned a general verdict. At that time the trial judge can instruct the jurors fully about forfeiture and submit the special verdict to them." The statement may be interpreted as advocating separate instructions, but not necessarily separate proceedings, on the issues of guilt and forfeiture. In any event, we decline to adopt a blanket rule allowing instructions on forfeiture only after the verdict on guilt has been returned. Nor are we willing to follow the court in *United States v. Sandini*, 816 F.2d 869 (3d Cir.1987), which has invoked its "supervisory powers to require that, in the future, in personam forfeiture proceedings, including evidence on that issue, be bifurcated from the guilt phase of criminal trials." *Id.* at 874.

Prior to its amendment in 1984,[22] RICO provided two bases upon which property could be declared forfeit:

(a) Whoever violates any provision of section 1962 of this chapter ... shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962, and (2) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which he has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962.

18 U.S.C. § 1963(a) (1982). The trial judge instructed the jury separately on two groups of assets sought by the government. The trial judge charged, in accordance with the indictment, that any asset in the first group, which consisted largely of various consulting fees and royalty payments received by Perholtz, could be declared forfeit if found beyond a reasonable doubt to be Perholtz's property, and either represented the proceeds of a charged racketeering offense or was used to afford Perholtz a source of influence over the enterprise. The assets in the second group included Perholtz's ownership interest in ATL, his interest in ATL's corporate address, his rights in all patents, copyrights, and licensing agreements pertaining to the ATAP software, and the contents of various bank accounts in the name of ATL or Perholtz ("Calvert Group" accounts). The trial judge explained that these assets could be declared forfeit if found beyond a reasonable doubt to be Perholtz's property, and were used to afford Perholtz a source of influence over the enterprise.

 Perholtz also challenges sufficiency of the evidence supporting the verdict of forfeiture. In reference to the first group of assets, without elaboration or support, he states that the evidence was insufficient to sustain forfeiture under either theory charged by the trial judge. Perholtz, how-

---

**21.** Rule 31(e) provides:
> (e) Criminal Forfeiture. If the indictment or the information alleges that an interest or property is subject to criminal forfeiture, a special verdict shall be returned as to the extent of the interest or property subject to forfeiture, if any.

**22.** By virtue of the Comprehensive Forfeiture Act of 1984, Pub.L. No. 98–473, Title II, § 302,

98 Stat. 2040 (1984), the following paragraph was added to section 1963(a).
> (3) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

ever, appears mainly to contest the forfeiture of the second group of assets. Specifically, he contests the forfeiture of the Calvert Group accounts. We need not address his contention that these funds did not represent the proceeds of racketeering activities, since the trial judge charged the jury under the forfeiture prong contained in section 1963(a)(2). Offering little factual support, Perholtz further asserts that "there was no evidence adduced to show that the funds were used to afford a source of influence over the enterprise described in the RICO offense." Perholtz's arguments on this issue are devoid of merit, and we hold that both groups of assets were properly forfeited.

"The legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Russello v. United States*, 464 U.S. 16, 26, 104 S.Ct. 296, 302, 78 L.Ed.2d 17 (1983); *United States v. Turkette*, 452 U.S. 576, 588–89, 101 S.Ct. 2524, 2531, 69 L.Ed.2d 246 (1981) (RICO enacted as part of legislation designed to combat the pervasive organized crime problem). Not only does the statute contemplate the forfeiture of the right to profits and proceeds derived from racketeering, *see Russello*, 464 U.S. at 22, 104 S.Ct. at 300, but in addition, Congress sought to divest a defendant from his ownership interest in an organization he had conducted through a pattern of racketeering activity. *United States v. Rubin*, 559 F.2d 975, 992 (5th Cir.1977), *vacated and remanded on other grounds*, 439 U.S. 810, 99 S.Ct. 67, 58 L.Ed.2d 102 (1978), *aff'd in part, rev'd and remanded in part*, 591 F.2d 278 (5th Cir.), *cert. denied*, 444 U.S. 864, 100 S.Ct. 133, 62 L.Ed.2d 87 (1979). To this end, forfeiture is mandatory if the jury has determined that the statutory criteria have been met. *See United States v. Godoy*, 678 F.2d 84, 88 (9th Cir.1982), *cert. denied*, 464 U.S. 959, 104 S.Ct. 390, 78 L.Ed.2d 334 (1983); *United States v. L'Hoste*, 609 F.2d 796, 812–13 (5th Cir.) *cert. denied*, 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980).

The trial evidence clearly demonstrated that the first group of assets were derived from payoffs and kickbacks from the various entities and individuals comprising the racketeering enterprise. As to the second group of assets, there is sufficient evidence to link Perholtz's conduct to the racketeering activity and to the enterprise charged in the indictment. *See Cauble*, 706 F.2d at 1348; *Huber*, 603 F.2d at 396–97. In sum, it was demonstrated that ATL, controlled by Perholtz, entered into bogus agreements with various corporations charged in the indictment as part of the association-in-fact enterprise. Perholtz used ATL as a principal vehicle through which payments were made to, and received from, other participants in the illicit enterprise. Hence, we hold that Perholtz's assets, including Perholtz's ownership in ATL, ATL's corporate assets, and the Calvert Group accounts, were properly forfeited.

### III. CONCLUSION

The convictions of appellants Perholtz, Jackson, and Fletcher are affirmed in all respects.

*So ordered.*