927 F.2d 605
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles F. COLLINS (87-1283), Francis R. Fitzsimmons
(87-1284/2038), Sol Schwartz (87-1285), Roger
Towne (87-1286/2072), Defendants-Appellants.
 Nos. 87-1283 to 87-1286, 87-2038 and 87-2072.
 United States Court of Appeals, Sixth Circuit.
 Feb. 26, 1991.
 
 On appeal from the United States District Court for the Eastern District of Michigan, No. 84-20715; Freeman, J.
 E.D.Mich.
 AFFIRMED.
 Before NATHANIEL R. JONES and ALAN E. NORRIS, Circuit Judges, and JARVIS, District Judge.*
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 After a nine-month trial, a jury found Charles Collins, Francis Fitzsimmons, Sol Schwartz and Roger Towne guilty of conspiring to conduct a racketeering enterprise in violation of 18 U.S.C. Sec. 1962(d). The jury also found defendant Collins guilty of accepting things of value in violation of 18 U.S.C. Sec. 1954, and of participating in the conduct of an enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. Sec. 1962(c). The government charged that between the years 1979 and 1983, defendants had formed an association-in-fact which distributed health care plan contracts in exchange for kickbacks, trips, entertainment, and promises of future employment.
 
 
 2
 Defendants appeal their convictions arguing: (1) prosecutorial misconduct; (2) erroneous admission of hearsay testimony; (3) failure to deliver Brady exculpatory material to the defense; (4) failure to allege a Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise; (5) erroneous jury instructions allowing the jury to rely on non-crimes in convicting defendants of conspiracy; and (6) inflammatory rebuttal remarks by the prosecution. For the reasons that follow, we affirm the convictions of defendants Collins, Fitzsimmons, and Towne, but reverse the conviction of defendant Schwartz.
 
 I.
 
 3
 The Michigan Conference of Teamsters Welfare Fund ("the Fund") is an employee health care benefit plan for approximately 50,000 Michigan Teamsters and their families. From 1979-1983, the Fund was governed by four trustees, two representing labor and two representing management. Defendant Frank Fitzsimmons was a labor trustee for the Fund until January 2, 1980, when he resigned as a result of a conviction on an unrelated criminal charge. The Fund is subject to federal regulation under ERISA, 29 U.S.C. Sec. 1001 et seq. The trustees meet monthly to decide questions of policy. However, defendant Charles Collins, executive director of the Fund, and his staff handled the day-to-day operation.
 
 
 4
 Defendant Schwartz, together with his close associate Allen Dorfman, operated Federal Services Inc. ("FSI"), which provided claims processing services to the Fund. They also operated FSI's subsidiary, Federal Computer Services, Inc. ("FCS"), which provided computer services to the Fund. Defendant Roger Towne and his associate Edward Brown were principals of several health care delivery companies, including Delaware Professional Services, Inc. ("DPS"), and Combined Professional Services, Inc. ("CPS"). These companies design and administer health care benefit plans in return for an administrative fee, normally stated as a percentage of the total amount of medical claims. Terry Porter, who was acquitted on all counts below, was an associate and friend of both Towne and Fitzsimmons.
 
 
 5
 The government's evidence at trial established that Brown and Towne gave money and other things of value to Collins, Fitzsimmons, Schwartz, and Dorfman, because of their positions of influence with the Fund, in order to secure contracts to administer health care plans for the Fund.
 
 
 6
 A. Brown's and Towne's Initial Contact with the Fund and
 
 Things of Value Accepted by Collins
 
 7
 In 1979, Brown and Towne offered a new health care delivery system to the Fund. The system, called a "closed-panel" system, was designed to provide cost containment by requiring union members to use designated physicians. Brown and Towne turned to Towne's friend, Terry Porter, seeking an introduction to Frank Fitzsimmons, a trustee of the Fund. In return for the introduction, Brown promised to pay Porter a one dollar commission for every Teamster registered in their program.
 
 
 8
 Porter introduced Brown to Fitzsimmons, and Fitzsimmons, in turn, introduced Brown to Collins. In the winter of 1979, Brown and Towne met with Collins on several occasions regarding the proposed health care system. Collins informed them that, at the present time, the Fund was more interested in a dental contract than a medical contract. As a result, Brown decided to propose a package of dental benefits to the Fund (the "DPS dental plan").
 
 
 9
 Brown and Towne later learned that Dorfman and Schwartz were highly influential with Fund officials and their approval was a prerequisite for doing business with the Fund. In April 1979, Brown introduced himself to Schwartz, telling Schwartz that Collins had suggested that Brown call Schwartz to discuss the DPS proposal. The next day, Schwartz discussed the proposal with Collins in a telephone conversation. Schwartz, whose phone was wiretapped because of a separate federal investigation, told Collins that "the potential here [with the DPS dental plan] is staggering if we, you and I, go about it right." Schwartz lobbied the trustees for approval of the dental plan. Although one of the trustees suspected Dorfman and Schwartz of having a financial interest in the plan, Brown allayed their fears by representing that no person associated with the Fund had a financial interest in the plan.
 
 
 10
 In May 1979, the trustees instructed Collins to seek competitive bids for a dental plan. Collins did so, but failed to tell competing bidders that they were seeking a "closed-panel" plan. As a result, both competing bidders failed to submit acceptable proposals with competitive pricing. On May 24, 1979, the Board met to consider the proposals and, on June 1, voted to accept the DPS dental plan.
 
 
 11
 Between May 27 and June 6, 1979, Towne gave Collins two round-trip airline tickets between Detroit and Chicago, and was reimbursed by DPS. Brown and Towne also regularly socialized with Collins in Detroit area bars and restaurants, picking up his tab. Towne submitted vouchers for the cost of entertaining Collins on thirty-three occasions in 1979, sixty occasions in 1980, and seventy-nine occasions in 1981. In addition, Brown put Collins' girlfriend, Lesa Young, on the DPS payroll, giving her minimal responsibilities. He instructed her to be Collins' paramour and ensure that Collins, who suffered from a drinking problem, did not disclose his relationship with DPS. Collins and Young also took several pleasure trips, and lived at an apartment for five months at DPS expense.
 
 
 12
 Also in 1979, Collins suggested that Brown and Towne develop an optical plan for the Fund. In early 1980, the trustees approved the plan. In February, Towne, Brown, Collins, and another fund employee named David Griffmore, flew to Florida for a golfing vacation at DPS expense. In January 1981, Brown entertained Collins at a resort in Phoenix, Arizona. Brown and Towne also offered Collins the prospect of future employment with them; Collins later took the offer and worked for Brown in an Arizona health care venture.
 
 B. Things of Value Accepted by Fitzsimmons
 
 13
 From September to December 1979, Brown and Towne entertained Fitzsimmons at DPS expense. Some of the expenses were paid by Terry Porter, who in turn billed DPS. Fitzsimmons resigned his trustee position with the Fund on January 2, 1980 as a result of an unrelated conviction.
 
 
 14
 Beginning January 15, 1980, Porter began receiving monthly checks of $1,000 from CPS as commission payments for his role in obtaining the dental contract for Brown and Towne. From March 13, 1980 until June 19, 1981, Porter wrote checks in the amount of $400 made payable initially to Fitzsimmons and then to his wife. In return, Porter received promissory notes reciting that Fitzsimmons would repay the principal amount plus ten percent interest within one year. The notes also granted Porter a lien on future commissions Fitzsimmons might earn while working for Porter. Fitzsimmons, however, was apparently in no financial position to be making loans. The "loans" were later written off by Porter's company, Terrence Porter & Associates. In addition to the payments by Porter, defendant Brown was once observed handing Mrs. Fitzsimmons a large amount of cash in an envelope.
 
 
 15
 On September 11, 1980, the Fund awarded DPS its third contract--this time for the establishment of a medical practice. In May 1981, Brown asked a real estate agent to look for suitable locations for medical clinics. He also asked the agent to hire Mrs. Fitzsimmons to assist in locating the sites. Towne gave the agent a series of $2,000 checks, and directed the agent to withdraw an identical sum from the agent's accounts and give it to Mrs. Fitzsimmons. Mrs. Fitzsimmons was not a qualified real estate agent and did no substantial work to earn the money.
 
 
 16
 C. Things of Value Accepted by Dorfman and Schwartz
 
 
 17
 When the DPS dental contract was proposed to the Fund, Dorfman's and Schwartz's phones were being tapped pursuant to an unrelated criminal investigation. In various conversations in November 1979, Dorfman pressed Schwartz to explain how Brown secured contracts with the Fund. Dorfman worried that Brown could not be trusted and that Collins might become too independent of Dorfman's and Schwartz's influence. Dorfman and Schwartz also discussed the possibility of receiving a "marketing fee" from Brown.
 
 
 18
 On December 20, 1979, shortly before approval of the optical contract, Dorfman and Schwartz met with Brown; their conversation was surreptitiously recorded. Schwartz demanded "some kind of proprietary interest" from Brown. Brown agreed to have Schwartz's company, FCS, handle his computer needs and to pay a percentage of the Fund's fee to Dorfman and Schwartz. Brown also indicated a willingness to set up a partnership in which Schwartz and Dorfman would receive fifty percent of DPS's commission. During the meeting, Brown tendered checks to Schwartz and Dorfman but they refused them since the checks were made payable to FCS. Schwartz recommended that they set up a company to receive the checks and told Brown they would give him a proper designation for the checks at a later time. There is no evidence to suggest that Dorfman and Schwartz ever accepted any of these checks, but Brown continued to set aside funds for this purpose.
 
 
 19
 After Brown left the meeting, Schwartz and Dorfman discussed the "staggering" amount of money to be made and how to shelter it. Schwartz noted that there "won't be enough hours ... or enough places to hide the money." They considered opening a bank account in Switzerland and setting up a corporation in the Bahamas. Schwartz concluded that "there's nobody ... that knows we're involved in any kind of commission rigging.... Bobby [Holmes, a trustee], Chuck [Collins]--nobody."
 
 
 20
 D. The Fund's Relationship with Brown and Towne Deteriorates
 
 
 21
 Utilization of the medical clinics was low and the Fund lost $4,650,000 in 1980. By the spring of 1981, the Fund had disbursed $2,800,000 on the medical contract but only twenty-nine percent of the sum could be shown to have been utilized by union members. Responding to criticism, Brown and Towne proposed to underwrite the Fund's entire package of medical benefits, but the trustees rejected the plan on the advice of their actuary. Brown sought Dorfman's and Schwartz's assistance. Together, Brown, Schwartz, and Dorfman, presented a proposal to administer all of the Fund's health care benefits for six percent of the total amount of health care claims paid, under a company named Direct Benefit Administrators, Inc. The proposal was later rejected by the trustees on the advice of the actuary, who proposed that Blue Cross administer the hospital claims for 3.2% of the claims. The trustees adopted the recommendation deducting the Blue Cross fee from the current 6% administrative fee charged by DPS. Brown, Towne, Dorfman, and Schwartz eventually acceded to this proposal. The contractual relationship between DPS and the Fund ended in 1982.
 
 
 22
 While Fitzsimmons was incarcerated, Brown and Towne proposed to hire Fitzsimmons as a marketing consultant upon his release and had business cards made for him, but Fitzsimmons' attorney later determined that his conviction barred such employment.
 
 
 23
 In June 1983, Collins testified before a grand jury and falsely denied that Schwartz and Dorfman had any role in obtaining the dental contract for DPS. Two separate grand juries were convened to consider the evidence. On December 21, 1984, a grand jury in the Eastern District of Michigan returned an indictment charging defendants with RICO and ERISA violations.
 
 
 24
 Trial commenced in January 1986, and lasted nine months. Collins was convicted on all counts. Fitzsimmons was convicted of Counts 1, 2, and 5 but, in a post-trial motion, the court arrested judgment on Counts 1 and 5. Schwartz was convicted on Count 2. Towne was convicted on Counts 2 and 3, but the court arrested judgment on Count 3. After filing a notice of appeal in March 1987, the appellants learned of a surreptitiously recorded conversation between defendant Fitzsimmons and a government informant which they believed to contain exculpatory material. They filed a motion for remand, which was granted, and obtained an evidentiary hearing in the district court in January 1989. Upon entry of the trial court's order denying defendants' new trial motions, defendants appealed.
 
 II.
 A. Prosecutorial Misconduct
 
 25
 Defendants face a high burden in seeking to reverse a conviction because of prosecutorial conduct. Unless the alleged misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," an appellate court will not reverse the conviction. Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)). In habeas cases, this court has employed a four-factor analysis to determine whether conduct is so egregious as to render the trial fundamentally unfair. We consider (1) the degree to which the conduct complained of has a tendency to mislead the jury and prejudice the accused; (2) whether the conduct is isolated or extensive; (3) whether the conduct was deliberate or accidental; and (4) the strength of the competent proof against the accused. Angel v. Overberg, 682 F.2d 605, 608 (6th Cir.1982) (en banc) (quoting United States v. Leon, 534 F.2d 667, 679 (6th Cir.1976)). On direct review, where the court may exercise its supervisory power to rectify trial errors even in the absence of fundamental unfairness, prosecutorial misconduct will not commonly result in reversible error where the misconduct was not flagrant or where the proof of guilt is overwhelming. United States v. Bess, 593 F.2d 749, 757 (6th Cir.1979). Fed.R.Crim.P. 52(a) harmless error analysis applies to the court's exercise of its supervisory powers. Bank of Nova Scotia v. United States, 487 U.S. 250, 254-57 (1988) (district court should not dismiss an indictment for nonconstitutional error absent a showing of prejudice).
 
 
 26
 Defendants contend that the following incidents amount to prosecutorial misconduct:
 
 1. Incidents Before the Grand Jury
 
 27
 Incident 1: A grand juror asked prosecutor Corbett whether a "closed-panel" dental plan was illegal. Corbett replied that it was not illegal, but stated that he expected the witnesses to testify that DPS overcharged the Fund for substantial amounts in connection with the plan. The grand juror asked whether the investigation was related to the "mafia" or "organized crime." Corbett replied, "Not directly," but added that the name of Allen Dorfman had arisen in the investigation and that Dorfman "has a number of known associates that (have) last names end(ing) in vowels." The juror also wanted to know about the size of the operation. Corbett replied that it was a "very sophisticated financially well organized operation."
 
 
 28
 Incidents 2 & 3: Prosecutor Newcomer told the jurors that John Griffmore, a Fund employee under Collins who had been on the golfing vacation with Collins and Brown, might be uncooperative before he testified. Griffmore testified extensively and then left the stand momentarily while prosecutor Newcomer asked the jurors whether they had any questions for Griffmore. A grand juror expressed his view that Griffmore's testimony had been exhaustive. Another grand juror asked if Griffmore "knows anything?" Newcomer replied, "Yeah, You can judge that. I don't think we're going to get any more out of him. I think we got as much as we're going to get." Newcomer then received permission to excuse the witness.
 
 
 29
 With regard to another witness, Patricia Kenny, prosecutor Newcomer stated that she "could be [telling] the truth but I intend to put her under oath and at least ask her these questions." Kenny was a romantic interest of Collins after Collins' relationship with Lesa Young ended.
 
 
 30
 Incident 4: Prosecutor Newcomer made two references to Mr. Giacalone, a well-known Detroit area Mafia figure. The first was in questioning John Holmes, Collins' predecessor as executive director of the Fund. The second instance occurred seven months prior to Holmes' testimony.
 
 
 31
 Incident 5: Defendants charge the prosecutors with an "offensive anti-Semitic bias" arising from the use of the word Rabbi in the following question put to Trustee Ward: "Is that correct, that you were as concerned about Ed Brown having as his Rabbi or as his mentor someone who was going to give him influence, Dorfman and Schwartz, you were concerned about that?"
 
 
 32
 Incidents before the grand jury do not affect the fairness of the trial. Therefore, this circuit applies a strict standard for dismissal of an indictment because of alleged prosecutorial misconduct before the grand jury. In order to prevail on their claim, defendants must demonstrate that "prosecutorial misconduct is a long-standing or common problem in grand jury proceedings in the district." United States v. Azad, 809 F.2d 291, 294 (6th Cir.1986), cert. denied, Bigley v. United States, 481 U.S. 1004 (1987).
 
 
 33
 Defendants claim that prosecutors Newcomer and Corbett "testified" before the grand jury and improperly characterized witnesses' testimony. However, this argument is without merit. The prosecutors did not purport to act like witnesses; each "merely [gave] the grand jurors a preview of expected testimony and [did] not [act] as a witness himself." Azad, 809 F.2d at 294. In response to questions from the jury, it is appropriate for the prosecutor "to refer to the anticipated testimony and its expected source." Id. Although prosecutors should not generally comment on the veracity of witnesses before the grand jury, Newcomer's comment that "she could be telling the truth" was oblique, and the instance was isolated.
 
 
 34
 The "friends whose names end in a vowel" comment was unnecessary but made in response to a specific question from a juror regarding Mafia involvement. The two references to Giacalone were also isolated. Although they concerned an investigation unrelated to this one, the prosecutor mentioned the name for the purpose of jogging the witnesses' memories. Over the course of a grand jury which lasted many months, three allusions to possible organized crime connections are insufficient to prove prosecutorial misconduct.
 
 
 35
 Although some of the prosecutors' comments were unnecessary, they were inconsequential and incapable of seriously influencing the proceedings. Moreover, defendants do not even allege that prosecutorial misconduct has been a "long-standing or common problem" in the Eastern District of Michigan.
 
 2. Mistreatment of Witnesses
 
 36
 Defendants charge the government prosecutors with intimidating three witnesses in an attempt to influence their testimony. The only appropriate remedy, they suggest, is either dismissal of the indictment or a new trial.
 
 
 37
 a. Lesa Young
 
 
 38
 Lesa Young was Collins' girlfriend, and was allegedly put on the DPS payroll by Brown so that she could monitor Collins and prevent him from disclosing his relationship with DPS. She provided critical testimony because both men confided in her and because she was present on many occasions when Brown entertained Collins. She was reluctant to testify, she said, because she had changed her life and was afraid the news media would publicize her involvement.
 
 
 39
 Several days before Young was to testify, the government left a message on her answering machine. The next day, the government left a message at her place of employment, but she did not acknowledge either call. As she left work that day, she was approached by FBI agents. She fled in her car at a high rate of speed and, during the pursuit, the agents pounded on her car window while they were stopped at a traffic light. She headed toward Canada until her path was blocked on the Detroit side of the border. The agents told her that there was a warrant for her arrest; they then handcuffed her and drove her to FBI headquarters. Eventually, the agents told her that she was not under arrest. She was detained while the prosecutors debated whether to have her brought in front of a judge and acknowledge that she would come to court and testify. Instead, the agents handed her a new subpoena and allowed her to leave.
 
 
 40
 At the time Young was stopped, the government had already requested and been denied a material witness warrant by Judge Freeman, the trial judge assigned to this case. An hour after Ms. Young's arrest, the government obtained a warrant from the presiding district judge. The judge was not familiar with the case and had not been told that Judge Freeman had earlier denied a warrant.
 
 
 41
 At trial, Schwartz's defense attorney moved to strike her testimony on the grounds that the government's mistreatment of Young "insulted the integrity of the court" and prejudiced the defendants. The court denied the motion. Outside of the presence of the jury, defense counsel was permitted to question Young extensively about the incident and her treatment by the FBI. She testified that she had intended to cooperate all along, that she did not discuss her testimony with the government the day she was arrested, and that her testimony did not change as a result of the incident.
 
 
 42
 Defendant Collins claims that Young changed her testimony as a result of the government intimidation. At trial, Young testified that Brown paid Collins certain consulting fees while Collins was the executive director of the Fund. In earlier testimony, Young, had not mentioned this fact. In front of the jury, Collins' attorney questioned Young about her new disclosure. She stated that she had not mentioned it before because she did not think the receipt of consulting fees was illegal, and no one had asked her.
 
 
 43
 While the government's conduct in its treatment of Ms. Young is not laudable, Collins is the only defendant who even makes a claim of prejudice. In all but one respect, Young's testimony before her apprehension matched her testimony given afterwards. Young's testimony at trial belies Collins' assertion that Young's new testimony was a direct result of government intimidation. Young stated that, although she was somewhat intimidated by the government tactics, she did not change her testimony in any respect. On the day of the incident, she did not even discuss her testimony with the government. The sole purpose of the government's tactics was to ensure her presence at trial. On cross-examination, Young stated that she had not mentioned the consulting fees before trial because she did not think the receipt of consulting fees was illegal. Collins' attorney had adequate opportunity to impeach her testimony in front of the jury based upon the omission of the new testimony in her previous statements. In sum, there are insufficient grounds to believe that the government's misconduct resulted in any prejudice to defendant Collins.
 
 
 44
 b. Linda Riffle and Marjorie Thomas
 
 
 45
 Linda Riffle had been employed in an administrative capacity for one of defendant's Towne's companies and later for CPS. She testified on April 23, 1986, and at the end of the day was interviewed for an hour and one-half by government prosecutors. She then went to the offices of defense counsel for an interview, and apparently stated that the government had been very unpleasant with her and that there were several inaccuracies in the government reports of her previous interviews. After a one-week recess, she returned to the stand on May 5, completed her direct examination, and underwent cross-examination. The next day, she advised the court that she was too upset to continue her testimony and needed medication. She was excused for the day. She resumed cross-examination on May 9. At the close of cross, she accused defendant Porter and his counsel of making faces at her. At another point in the trial, her husband was removed from the courtroom after making an indecent remark to defendant Towne.
 
 
 46
 After Marjorie Thomas finished testifying for the day, both the prosecution and defense counsel requested to speak with her. She spent several hours talking with the government prosecutors and at 4:39 p.m. left a message on defense counsel's answering machine that she was "still tied up." She returned to her hotel room at 6:00 p.m. after she finished with the government. Defense counsel called her at 9:00 p.m. She told him that she had been at the government's office until 6:00 p.m. and was too tired to speak with them.
 
 
 47
 Defendants first contend that the government "manipulated Ms. Riffle by extending its preparation of her until she was emotionally and physically exhausted, as well as by intimidating her...." They argue that the purpose of this manipulation was to prevent defendants from interviewing Ms. Riffle. Defendants also assert that the government prevented Ms. Thomas from talking to defense counsel by extending its interview with her.
 
 
 48
 In the context of a nine-month trial with hundreds of witnesses, both incidents seem rather trivial. Nonetheless, defendants maintain that the government manipulated Riffle into an emotionally exhausted condition causing her to be hostile to the defense, and delayed Thomas to prevent her from talking with the defense. Understandably, Riffle was probably tired from a day-long direct examination on April 23, 1986, and resented having to attend interviews that same evening, first with the government and later with defense counsel. There is simply no factual basis, however, to support the claim that the government manipulated Riffle or that her hostility to the defense was caused by the government. Beyond a blanket claim of hostility to the defense, defendants fail to allege any specific prejudice. Similarly, the incident involving Thomas fails to evince either governmental misconduct or prejudice.
 
 3. Deliberate Disregard for Court Orders
 
 49
 a. Allegedly Discoverable Letters and Statements
 
 
 50
 Prior to trial, defendants filed a motion to dismiss the indictment on the ground that the government suppressed material discoverable under Brady v. Maryland, 373 U.S. 83 (1963). Defendants admit that they were given these materials prior to trial and therefore no Brady violation occurred. Nonetheless, they assert that the government's attempt to suppress these materials is prosecutorial misconduct. They also contend that, although the government gave them the materials a full month before trial, it was not in sufficient time to prevent their case from being prejudiced. They ask this court to find a violation of due process for prosecutorial misconduct, though they acknowledge no Brady violation occurred.
 
 
 51
 Because defendants fail to specifically state how they were prejudiced by the alleged suppression or why a month was insufficient time in which to review these materials, we must conclude that they were not prejudiced by the government's conduct.
 
 
 52
 b. FBI Agent Kelly Called to the Stand
 
 
 53
 At a pretrial hearing, the district court declined to rule as to the admissibility of certain coconspirator statements about which Agent Kelly was planning to testify. Apparently, there was some doubt as to whether they were made in furtherance of the conspiracy. The court advised prosecutor Newcomer not to refer to the evidence until a final ruling had been made.
 
 
 54
 At trial, Newcomer apparently forgot the matter was outstanding and called Kelly to the stand. Defense counsel whispered to Newcomer that this involved the challenged evidence. Newcomer acknowledged the matter and told the court that an outstanding legal issue had been brought to his attention. The day ended and the jury was dismissed. The court excluded the evidence the next morning, dismissed Kelly from the stand, and gave a curative instruction even though Kelly never testified. Defense counsel alleges that this incident shows prosecutorial misconduct and claims the jury was left with the impression that evidence was kept from them. Again, however, we fail to see any prosecutorial misconduct. Prosecutor Newcomer simply forgot about the outstanding ruling. It was called to his attention before any evidence was elicited, and the court gave a curative instruction. Ultimately, the court reversed its ruling and admitted Kelly's testimony anyway.
 
 
 55
 c. Inadmissible Evidence
 
 
 56
 Defendants cite two instances where the government posed certain questions to witnesses and the defense counsel objected. In one, a heated exchange ensued and the government withdrew the question (FBI Agent Simpson was asked to interpret a taped conversation). In the second (Judith Burke was questioned about Brown's relationship with Mrs. Fitzsimmons), the court held a bench conference and then gave the government a little leeway on relevancy. On redirect, the government asked another question pertaining to the matter, the defense objected, and the court sustained the objection. Neither instance lends itself to a finding of prosecutorial misconduct and again no prejudice has been demonstrated.
 
 
 57
 d. Alleged Misrepresentations to the Court
 
 
 58
 Two of the alleged misrepresentations are inconsequential. In the first, defendants claim the government misrepresented the qualifications of an expert witness, stating that he had been previously qualified as an expert in federal court when in fact he had only given testimony in a deposition. The district court excluded the witness' testimony; hence, no prejudice resulted.
 
 
 59
 The second alleged misrepresentation occurred when the court revised its scheduling after the government advised the court that its witness (Max Kunis) had heart problems. In fact, the witness' heart problems were ten years old and the witness wanted to revise the court's schedule because of his business concerns. Here, the witness was responsible for the misrepresentation, not the government, and again, no prejudice resulted.
 
 
 60
 The next incident was the subject of a lengthy post-trial evidentiary hearing and a twenty-six page opinion issued by Judge Freeman. In short, the Justice Department arranged for an informant to talk with Fitzsimmons while he was in jail regarding a criminal investigation unrelated to this case. The FBI specifically told the informant not to engage Fitzsimmons in a discussion about this case, and to steer the conversation away from this case if it was mentioned. The informant ignored the instructions, encouraging Fitzsimmons to get rid of his lawyer and make a deal with the government. None of the taped conversation was used at trial. Instead, the government sought a protective order barring disclosure of the recording in order to protect the identity of the informant. The court granted the protective order relying upon an offer of proof which was later discovered to have contained false statements. For example, the offer of proof stated that Fitzsimmons was a target of a nationwide labor racketeering investigation. In reality, he was only being investigated in connection with a local investigation concerning his operation of an airport limousine service. Defendants maintain that making these false statements in the offer of proof is another example of prosecutorial misconduct.
 
 
 61
 In its post-trial opinion denying relief, the district court found that, although the government's offer of proof contained several false statements, the sealing of the taped conversation was nonetheless proper in order to protect the identity of the informant. Apparently, neither prosecutor Newcomer nor prosecutor Corbett knew their statements were false when they made them. The alleged misrepresentations in the offer of proof were of no consequence since the evidence never reached the jury. Defendants, therefore, suffered no prejudice.
 
 
 62
 e. Alleged Misuse of Subpoenas
 
 
 63
 Defendants charge the government with misusing the subpoena power by using trial subpoenas to interview several Californians for the purpose of preparation for trial. One of the subpoenas was issued shortly before trial, the other three were issued during the trial but the witnesses did not testify. Of the three who did not testify, one traveled to Michigan and was interviewed by prosecutors but not put on the stand. The other two did not make the trip. Defendants made no contemporaneous objection when the subpoenas were requested or issued. They also fail to point out how any prejudice resulted.
 
 4. Summary
 
 64
 Defendants have recited numerous incidents in the apparent hope that through the sheer number presented, this court would find that the cumulative effect of these errors deprived them of a fair trial. However, most of the incidents cited do not amount to misconduct, and none of the incidents resulted in prejudice to defendants' causes.
 
 
 65
 B. Admission of Coconspirator Hearsay Statements
 
 
 66
 Defendant Schwartz contends that the trial court erred by refusing to grant a mistrial when it ruled that certain hearsay testimony had been improperly admitted into evidence. The government's case included the testimony of Judith Burke and Lesa Young, and two letters from Brown and Towne to Allen Dorfman. Burke, an employee and companion of Brown, testified that Brown told her that Schwartz was lending assistance in obtaining additional Teamster contracts in Oakland, California, and in other areas. Brown also told her that Schwartz would have a proprietary interest in DPS's business in California. Brown indicated that Dorfman and Schwartz were partners and that Dorfman's approval was needed to do business with the Teamsters. Lesa Young testified that, according to Collins, Dorfman had been a key person in obtaining contracts for Brown. Young did not, however, mention Schwartz in that portion of her testimony; she speaks only of Dorfman.
 
 
 67
 In addition to Burke's testimony, the government introduced two exhibits: two letters from Brown and Towne to Dorfman, detailing the marketing fees, computer service fees, and proprietary interest that Dorfman and Schwartz were to receive in the proposed financial relationship. Marjorie Thomas, Brown's secretary, testified that, although drafted, the letters were never sent.
 
 
 68
 The district court first admitted the evidence subject to the procedure prescribed in United States v. Vinson, 606 F.2d 149 (6th Cir.1979), cert. denied, 444 U.S. 1074 (1980). Vinson allows the government to admit coconspirator hearsay statements subject to the government's later demonstration by a preponderance of the evidence that: (1) a conspiracy existed; (2) defendant was a participant in the conspiracy; and (3) the statements admitted were made in the course of and in furtherance of the conspiracy. Id. at 153.
 
 
 69
 After the hearsay statements were admitted, the district court found by a preponderance of the evidence that a conspiracy existed and that Schwartz was a participant. However, the court concluded that the statements and exhibits were not made in furtherance of the conspiracy. Therefore, the court struck the evidence from the record. The court offered a cautionary instruction to defendant Schwartz, but Schwartz declined believing that the instruction would only highlight the evidence in the mind of the jurors, and that the only effective remedy would be to declare a mistrial as to him. In his closing instructions, the trial judge admonished the jury not to consider stricken testimony or exhibits.
 
 
 70
 Although this is a borderline case, we must grant a new trial to defendant Schwartz because the stricken testimony significantly prejudiced his trial. As we noted in Vinson, "[i]f the court finds that the government has failed to carry its burden [as to proving that the hearsay evidence was in furtherance of the conspiracy], it should, on defendant's motion, declare a mistrial unless convinced that a cautionary jury instruction would shield the defendant from prejudice." Vinson, 606 F.2d at 153. In this case, we are not convinced that the cautionary instruction offered by the district court judge would have been sufficient to shield defendant from prejudice; nor did the closing charge admonishing the jury to disregard stricken testimony adequately protect defendant Schwartz.
 
 
 71
 In reaching this conclusion we are aware of the general proposition that
 
 
 72
 [w]e normally presume that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions, ... and a strong likelihood that the effect of the evidence would be "devastating" to the defendant.
 
 
 73
 Greer v. Miller, 483 U.S. 756, 766 n. 8 (1987) (citations omitted). Although the hearsay testimony stricken by the district court may not have been the most damaging evidence against Schwartz, the erroneously admitted evidence so reinforced the other evidence against Schwartz that there is an "overwhelming probability" that the stricken evidence influenced the jury to conclude that Schwartz was guilty of conspiracy.
 
 
 74
 C. Fitzsimmons, The Sixth Amendment Violation, and Brady Material
 
 
 75
 Defendant Fitzsimmons argues that the government violated his right to counsel by having a government informant record his conversations with the informant when the government knew Fitzsimmons was under indictment and had hired a lawyer.
 
 
 76
 Lenny Schultz, a government informant, approached the government offering to elicit information from Fitzsimmons in return for a plea agreement on drug charges. The Justice Department was then investigating Fitzsimmons in connection with a nationwide labor racketeering investigation. The government told the informant not to discuss any matter pertaining to the instant case, and instructed him to keep the conversation away from this case. Schultz ignored the instructions, however, discussed the facts of this case, and advised Fitzsimmons to forget about his attorney and to strike a deal with the government. Neither Newcomer nor Corbett, the prosecutors in this case, were consulted prior to this incident. They first learned of the incident after it had already occurred. Newcomer reviewed the transcript and decided to use it only for impeachment purposes if Fitzsimmons took the stand. He then sought a protective order to prevent disclosure of the transcript, in order to protect Schultz's identity. The district court granted the protective order and found that it contained no Brady material.
 
 
 77
 After the trial ended in this case, Schultz was brought to trial on the drug charges and his identity was revealed. Prosecutor Newcomer moved the court to remove the protective order in this case and delivered a copy of the transcript to defendants. Fitzsimmons then filed a motion for a new trial alleging that his Sixth Amendment rights had been violated, and that the transcript contained Brady material, the suppression of which violated due process. The trial court issued an opinion concluding that, although Fitzsimmons' Sixth Amendment rights were violated, he suffered no prejudice since the material had not been introduced against him at trial, did not contain any information related to defense strategies or communication subject to the attorney-client privilege, and did not contain any information that the government did not otherwise have.
 
 
 78
 Fitzsimmons argues that a showing of actual prejudice is not necessary and that prejudice should be presumed, citing United States v. Levy, 577 F.2d 200 (3d Cir.1978), and Briggs v. Goodwin, 698 F.2d 486, 493-94 (D.C.Cir.1983). In both Levy and Briggs, the court presumed prejudice because the government informant was privy to conversations between defendant and his attorney and disclosed some of that information to the government. The Levy court held that prejudice is presumed "at the point where attorney-client confidences are actually disclosed to the government enforcement agencies responsible for investigating and prosecuting the case," Levy, 577 F.2d at 209; the defendant need not show the information was actually used by the prosecutors or of benefit to them.
 
 
 79
 Levy and Briggs, however, have no application to the facts of this case. Schultz was not present at any attorney-client meetings. Schultz and Fitzsimmons did not discuss attorney-client communications or defense matters, other than Schultz having disparaged Fitzsimmons' attorney and urged him to plea bargain. "Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted." United States v. Steele, 727 F.2d 580, 586 (6th Cir.1984) (citing United States v. Morrison, 449 U.S. 361 (1981), and Weatherford v. Bursey, 429 U.S. 545 (1977)), cert. denied, Scarborough v. United States, 467 U.S. 1209 (1984). A review of the transcript confirms the district court's conclusion that no attorney-client communication, information or defense strategies were revealed; hence, defendant Fitzsimmons suffered no prejudice.
 
 
 80
 As to the Brady issue, Fitzsimmons must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). We concur with the district court that very little information in the transcript has exculpatory value. In his conversation with Schultz, Fitzsimmons merely denied the charges against him. He admitted that he and his wife accepted money, but claimed that it was bona fide compensation. He expressed disbelief that his actions constituted crimes, or that he could have influenced the Fund after he resigned. He also stated that the dental plan would save the Fund money. While the statements may have had some exculpatory value--for example, as bearing on whether he believed he was part of a larger enterprise to defraud the Fund--the evidence, had it been disclosed to the defense, would not have changed the result. Most of the statements are largely self-serving expressions of surprise that his actions were illegal.
 
 
 81
 D. Brady Material as To Defendants Schwartz and Towne
 
 
 82
 In separate assignments of error, Schwartz and Towne allege that the conversation between Fitzsimmons and Schultz contained exculpatory evidence entitling them to a new trial under Brady. The district court rejected both their claims in its memorandum opinion, finding no Brady material in the conversation. Like Fitzsimmons, Schwartz and Towne must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682.
 
 
 83
 The only notable reference to Schwartz in the conversation was shortly after Schultz suggested that Fitzsimmons make a deal, and asked him what "these guys" meant to him.
 
 
 84
 Fitzsimmons: Lenny I don't know what ... their deal is. I don't know nothing about Sol Schwartz.
 
 
 85
 Schultz: Yeah. Who is he?
 
 
 86
 Fitzsimmons: I don't ... He was Allen Dorfman's partner.
 
 
 87
 Schwartz contends that this excerpt is "highly exculpatory" and tends to prove that Schwartz had nothing to do with the alleged conspiracy. The district court disagreed, stating that, although some of the conversation might have been "useful" to some of the defendants, it did not have a reasonable probability of affecting the outcome of the trial. With regard to Schwartz's contention, the court noted that Fitzsimmons' self-serving statement that he knew "nothing about" Schwartz contradicts more probative evidence. Schwartz routinely attended trustee meetings when Fitzsimmons was present, and the taped conversations of Schwartz and Dorfman reveal that they were aware of Fitzsimmons' involvement. Even if Fitzsimmons did not know of Schwartz's involvement, "[it] is not necessary ... for all the co-conspirators to know each other or to have worked together on all phases of the criminal enterprise." United States v. Winship, 724 F.2d 1116, 1122 (5th Cir.1984). However, interpreted, Fitzsimmons' comment was not significant. At best, Fitzsimmons' brief reference to Schwartz is ambiguous and, therefore, its exculpatory value is slight. In light of the more probative tapes demonstrating Schwartz's involvement, there is not a reasonable probability that the material would have affected the outcome of the trial had it been available for use at trial.
 
 
 88
 Defendant Towne claims that the conversation also contained exculpatory Brady material as to him. The only notable references to Towne in the conversation are the following:
 
 
 89
 Fitzsimmons: Back in June, July or August of 1979, I, I was under indictment, Roger Towne and Ed Brown came and was with Bobby, Bobby and I as trustees, we took them up north as far as the Seminar. We like their pro', I liked their program.... It was this uh, cap', uh, captuated program. And every insurance company in, in business today is doing it.... It was a hell of a program.... They, you know, they were taking all their ... money.
 
 
 90
 * * *
 
 
 91
 * * *
 
 
 92
 I don't know what Ed Brown and Roger Towne did.... Hey, if I knew.... If I truthfully knew ... I'd tell 'em but I don't know what ... they're talkin'. They're talking about skimmin' a million dollars ... a month ... or somethin'.... Well, I don't know what they did.
 
 
 93
 Fitzsimmons also stated that Towne had put his wife to work, that she had received $11,000, and that "that goddamn thing, that's one count." He also stated that Towne had promised him $2,500 a month as a consultant because of his connections with labor. The exculpatory value of these statements is slight; rather, statements that Towne and Brown were "taking all their ... money" tend to be incriminating. Although some of these statements could be interpreted as attempts to explain the dealings with Brown and Towne as bona fide, and others as expressions of ignorance about the alleged conspiracy, none could be said to be exculpatory to the extent that there is a reasonable probability the outcome would have been different.
 
 
 94
 E. Whether the Indictment Adequately Alleges a RICO Enterprise
 
 
 95
 Here, appellants make three assertions: (1) Counts 1 and 2 fail to adequately allege an enterprise with an ascertainable and identifiable structure distinct from that inherent in the conduct of a pattern of racketeering; (2) the RICO counts are impermissibly vague in violation of the Sixth Amendment; and (3) according to the RICO definition of enterprise, an enterprise cannot consist of a 'group of legal entities' such as corporations.
 
 
 96
 The RICO statute defines an enterprise as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. Sec. 1961(4). Counts 1 and 2 allege the enterprise to be comprised of the following entities: the Fund, DPS, DNC dba CPS, NHC, Occumedics, MHHS, TPA, Federal Services, and Federal Computer.
 
 
 97
 In United States v. Turkette, 452 U.S. 576, 583 (1981), the Supreme Court noted that the pattern of racketeering activity element refers to a "series of criminal acts," while the enterprise element refers to an "ongoing organization" in which the "various associates function as a continuing unit." The Court recognized, however, that the same evidence which proves the enterprise may also suffice to prove the pattern of racketeering activity. Id.
 
 
 98
 Circuits have interpreted Turkette differently. In order to distinguish pattern from enterprise, several circuits have added a third requirement: the enterprise must be "separate and distinct" from the pattern of criminal acts. United States v. Bledsoe, 674 F.2d 647, 663-65 (8th Cir.), cert. denied, Phillips v. United States, 459 U.S. 1040 (1982); United States v. Riccobene, 709 F.2d 214, 223-24 (3d Cir.), cert. denied, Ciancaglini v. United States, 464 U.S. 849 (1983). It must have "an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity." Bledsoe, 674 F.2d at 665. In other words, the parties' association or enterprise must have some distinct character or structure apart from their joint participation in criminal activities, otherwise RICO simply punishes the commission of two of the specified "racketeering" crimes within ten years. Id. at 664. The Sixth Circuit, however, has specifically rejected "the position that there must be proof of an enterprise distinct from proof of a pattern of racketeering." United States v. Qaoud, 777 F.2d 1105, 1115 (6th Cir.1985), cert. denied, Callanan v. United States, 475 U.S. 1098 (1986).
 
 
 99
 Actually, in this case, the association-in-fact alleged in the indictment constitutes a separate RICO enterprise. The group of corporations mentioned in the indictment associated for a number of purposes other than illegal activity. They associated for legitimate purposes even though the relationships and associations between the entities were sometimes used for illegal personal gain. As corporations, they formed a distinct and separate structure apart from the pattern of criminal acts. United States v. Feldman, 853 F.2d 648, 660 (9th Cir.1988) ("The corporate entities had a legal existence separate from their participation in the racketeering, and the very existence of a corporation meets the requirement for a separate structure."), cert. denied, 109 S.Ct. 1164 (1989).
 
 
 100
 Defendants' second contention, that the indictment is impermissibly vague, is without merit. Counts 1 and 2 adequately apprise defendants of the charges against them and state all of the elements of the offense charged. See Russell v. United States, 369 U.S. 749, 763 (1962).
 
 
 101
 Defendants' third contention is that a group of corporations cannot be an association-in-fact within the meaning of section 1961(4). Section 1961(4) defines enterprise to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. Sec. 1961(4). Defendants maintain that a group of corporations cannot be a "group of individuals associated in fact," since corporations are not individuals. Such novel interpretations of section 1961(4), however, have been rejected as contrary to the word "includes," which indicates the list is not exhaustive or exclusive, and contrary to the congressional mandate to "liberally construe" the statute. See, e.g., United States v. Perholtz, 842 F.2d 343 (D.C.Cir.), cert. denied, 488 U.S. 821 (1988); United States v. Navarro-Ordas, 770 F.2d 959, 969 n. 19 (11th Cir.1985) (group of corporations may constitute association-in-fact), cert. denied, Rodriguez v. United States, 475 U.S. 1016 (1986).
 
 
 102
 Appellants' reading of section 1961(4) would lead to the bizarre result that only criminals who failed to form corporate shells to aid their illicit schemes could be reached by RICO. This interpretation hardly accords with Congress' remedial purposes: to design RICO as a weapon against the sophisticated racketeer as well as (and perhaps more than) the artless.
 
 
 103
 Perholtz, 842 F.2d at 353.
 
 
 104
 We agree with the decisions in Perholtz and Navarro-Ordas, and, therefore, hold that corporations can be "individuals associated in fact."
 
 
 105
 F. Reliance on Time-Barred Predicate Acts as Evidence of
 
 
 106
 Defendants' Participation in RICO Conspiracy
 
 
 107
 Defendant Fitzsimmons was found guilty of Count 1 (substantive RICO), Count 2 (RICO conspiracy), and Count 5 (section 1954 receiving and soliciting things of value). Defendant Towne was found guilty of Counts 2 and 3 (section 1954 violations). Following the verdict, the court granted Fitzsimmons' and Towne's motion to arrest judgment on Counts 1 and 5 as to Fitzsimmons and Count 3 as to Towne. Fitzsimmons and Towne now challenge their conspiracy conviction under Count 2 contending that it is impossible to determine whether the jury relied on legally sufficient grounds when it convicted them of the conspiracy count. We will discuss the issue only with regard to Fitzsimmons, since the analysis is similar for Towne.[1]
 
 
 108
 The district court found the indictment insufficient to sustain Counts 1, 3, and 5 for the following reasons. To be convicted of a substantive RICO count, a defendant must have committed two predicate acts, at least one of which is within the five-year limitations period set forth in 18 U.S.C. Sec. 3282. United States v. Walsh, 700 F.2d 846, 851 (2d Cir.), cert. denied, 464 U.S. 825 (1983). The indictment in this case was returned on December 21, 1984, so, for Fitzsimmons to be guilty of substantive RICO violations, at least one of his predicate acts must have been committed after December 21, 1979. Of the three predicate acts he is alleged to have committed only one could meet that requirement. The government alleges that from April 23, 1979 until January 2, 1980, Fitzsimmons received and solicited things of value to influence the operations of the Fund in violation of 18 U.S.C. Sec. 1954. This allegation is also the basis of the section 1954 offense charged in Count 5, and is substantially similar to the separate paragraphs and acts pleaded in the conspiracy count (Count 2). The illegal activities asserted in each of these counts end on January 2, 1980, because Fitzsimmons resigned his position as of that date; a person can commit a section 1954 violation only when he is an "administrator, trustee ... or employee" and accepts or solicits things of value. See 18 U.S.C. Sec. 1954.
 
 
 109
 The government admitted below that the allegations charge a continuing offense, that is, an offense which spans a period of time rather than a discrete act. When the period specified in the continuing offense spans the statute of limitations period, as in this case, the crime is not barred by the statute of limitations as long as the proscribed course of conduct continues into the limitation period. See Toussie v. United States, 397 U.S. 112 (1970). A continuing offense may be charged only in limited circumstances, however, since "the tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends the statute beyond its stated terms." Id. at 115. Whether a continuing offense can be charged depends upon whether Congress intended or contemplated the statutory offense as a continuing one. A statute should not be interpreted as providing for a continuing offense "unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." Id.
 
 
 110
 In its pretrial order denying relief, the district court concluded that section 1954 could properly be charged as a continuing offense since section 1954 "is inherently capable of continuing over an extended period of time." Relying on the legislative history of the statute, the court reasoned that the complexity of kickback schemes necessarily entails a continuous pattern of activity, rather than a single, discrete act. In a post-trial opinion, however, the court reversed its position, holding that section 1954 cannot be charged as a continuing offense. As a result, the district court arrested judgment on Counts 3 and 5 since the section 1954 offenses alleged in them were pleaded as continuing offenses, and on Count 1 since the predicate act was alleged as a section 1954 continuing offense and it was Fitzsimmons' only predicate act within the necessary limitations period for the RICO substantive count. The government did not appeal this holding, so we do not address it.
 
 
 111
 At issue on appeal is the effect that the arrest of judgment of Counts 1, 3, and 5 have on Fitzsimmons' and Towne's conspiracy convictions under Count 2. Defendants claim that they are entitled to a new trial on Count 2 because the conspiracy jury instruction permitted the jury to find them guilty of conspiracy by relying on predicate acts which were not in themselves offenses. The court's jury instruction on the conspiracy charge stated:
 
 
 112
 The government satisfies its burden [of proving participation in the conspiracy] if it proves, beyond a reasonable doubt, either that the defendant agreed to personally commit two acts of racketeering or that the defendant agreed that another would commit two acts of racketeering.
 
 
 113
 (Emphasis added.)[2] Fitzsimmons argues that the conspiracy conviction must be nullified because the jury could have relied on the invalid predicate act to convict him of conspiracy. The arrest of judgment, Fitzsimmons argues, essentially declares that some of the predicate acts do not constitute offenses. The jury instruction, however, allowed the jury to convict him of conspiracy if it found he committed these acts, which, because they were pleaded as continuing offenses, do not state offenses and, therefore, cannot serve as a sufficient legal basis for the conspiracy conviction.
 
 
 114
 Defendant's argument is akin to stating the general proposition of law that a person cannot be convicted of conspiracy when the object of the conspiracy does not state an offense. In other words, Fitzsimmons cannot be convicted of conspiring to commit predicate acts, when the predicate acts are themselves legally insufficient to state an offense. Focusing on the either/or nature of the jury instruction, he contends that the jury may have relied on legally insufficient acts to convict him of conspiracy. Fitzsimmons cites several cases holding that where a conspiracy conviction is based upon allegations that the objects of the conspiracy were violations of criminal statutes and one of the allegations fails to state an offense, the conspiracy charge and conviction are fatally defective. See Stromberg v. California, 283 U.S. 359, 367-68 (1931) (where there is doubt as to whether a conviction is predicated upon an impermissible ground, that doubt must be resolved in favor of the defendant and the conviction vacated); Leary v. United States, 395 U.S. 6, 31-32 (1969); Chiarella v. United States, 445 U.S. 222, 237 n. 21 (1980); Zant v. Stephens, 462 U.S. 862 (1983); Callanan v. United States, 881 F.2d 229, 235 (6th Cir.1989), cert. denied, 110 S.Ct. 1816 (1990); United States v. Mandel, 862 F.2d 1067, 1074 (4th Cir.1988) (general verdict RICO conspiracy conviction must be reversed where it is impossible to determine what decision the jury made with respect to various valid and invalid predicate acts), cert. denied, 109 S.Ct. 3190 (1989).
 
 
 115
 The government maintains that Fitzsimmons need not have performed any predicate acts to be a participant in the conspiracy. See United States v. Tripp, 782 F.2d 38, 41 (6th Cir.) (a RICO conspiracy does not require proof of any overt act or proof that any predicate act of racketeering was actually committed), cert. denied, 475 U.S. 1128 (1986). Furthermore, the government asserts that even time-barred predicate acts, although insufficient to state offenses in themselves, can serve as the basis for finding that the defendant agreed to participate in a conspiracy. See United States v. Persico, 832 F.2d 705 (2d Cir.1987) (conspiracy convictions upheld even though the predicate acts of these defendants occurred more than five years prior to the date of the indictment), cert. denied, Russo v. United States, 486 U.S. 1022 (1988).
 
 
 116
 The differing positions are due in part to differing characterizations of the effect of Fed.R.Crim.P. 34. Defendant characterizes the ruling below as deeming the predicate acts non-offenses. Since the instruction permitted the jury to find a conspiracy if it found agreement to perform these "non-offenses," the conspiracy conviction, according to defendant, must fail. The government offers a narrower characterization. Although the predicate acts are technically not offenses because they were time-barred (or more appropriately invalidly pleaded continuing offenses in an attempt to defeat the time-bar), they nonetheless are sufficient to demonstrate that defendant had agreed to participate in the joint objectives of the conspiracy by agreeing to perform two predicate acts. To the extent the jury relied on the actual acts alleged in those non-offenses, it relied on acts which were sufficient to demonstrate defendant's participation within the conspiracy. We agree with the latter characterization. Even though non-offenses, the acts alleged were sufficient to demonstrate that Fitzsimmons agreed to commit two racketeering acts. By agreeing to commit those acts, Fitzsimmons entered into the conspiracy. The conspiracy, composed of multiple participants and having broad objectives beyond these particular acts, continued past December 21, 1979 and into the limitations period. Fitzsimmons did not withdraw from the conspiracy before such time, and can, therefore, be held accountable for its actions. Similarly, because Towne's alleged act in Count 3, even though a non-offense, could serve as a basis for finding he participated in the conspiracy, his conviction on Count 2 is also valid.
 
 
 117
 The jury instruction should not be interpreted as simply bootstrapping a conspiracy conviction onto a finding of the requisite elements of a substantive conviction. The jury is asked to determine whether the defendant "agreed to commit two racketeering acts." Assuming that the jury found that defendants agreed to commit these acts, as Fitzsimmons and Towne ask us to do, it is the agreement to commit these acts, not the acts themselves, that is the basis of the conspiracy conviction.
 
 G. Prosecutor's Rebuttal Comments
 
 118
 In his rebuttal, prosecutor Newcomer referred to the stricken coconspirator hearsay testimony provided by witness Judy Burke. Burke testified that she had overheard a conversation between Brown and Frank Fitzsimmons, Sr. (defendant Fitzsimmons' father) in which Fitzsimmons thanked Brown for "taking care of my son and his family in their time of need." Defendant Fitzsimmons claims that this statement, later stricken, constituted the only direct evidence that he personally (not including his wife) received anything of value after he left the Fund; all other evidence was circumstantial.
 
 
 119
 While attempting to demonstrate that Fitzsimmons received money after leaving office, prosecutor Newcomer stated that "there's testimony that there were monthly contacts between Mrs. Fitzsimmons and Mr. Brown for business purposes." Contrary to Newcomer's assertion, however, there was no testimony of monthly contacts between Brown and Fitzsimmons other than that contained in Burke's stricken testimony. Fitzsimmons' counsel objected to the rebuttal statements and moved for a mistrial. The court gave a curative charge instructing the jury to disregard testimony concerning Brown's visits to Mrs. Fitzsimmons and the reference made to it in rebuttal. The comment is not so prejudicial that a new trial is required; we can presume that a jury will follow the instruction to disregard the inadmissible evidence presented to it as well as the reference in rebuttal. See Greer v. Miller, 483 U.S. 756, 766 n. 8 (1987).
 
 
 120
 Fitzsimmons also objects to Newcomer's comment that Fitzsimmons was an "excon." Newcomer was asking the jury to find that Fitzsimmons solicited the money he and his wife received in 1980 and 1981 before he ever left the Fund in January 1980. The tacit agreement to accept money could have come even before he left the Fund, Newcomer argued, because Brown and Towne were aware that Fitzsimmons would be an influential union contact even after he was released from jail. In that context, Newcomer stated, "[b]y this time he's an ex-con who ... may have union contacts, but severely damaged union contacts, unless that's a badge of courage within the Teamster's union, which I can't believe."
 
 
 121
 Fitzsimmons charges that the reference was inflammatory and, along with the other indirect reference to Burke's testimony about Frank Fitzsimmons, Sr., was an attempt to portray this case as a "Teamsters case." The government responds that, although calling Fitzsimmons an ex-con might have been indelicate, it was neither false nor misleading. Presumably, it had been disclosed earlier in the trial that Fitzsimmons had previously been convicted of a felony, and his conviction was the reason he had resigned as trustee of the Fund. Again, taking the comment in its context, it does not rise to the level of reversible error. The rebuttal itself lasted for approximately fifty pages of transcript. The isolated reference does not suggest that the jurors should convict Fitzsimmons because he had previously committed a felony, it only suggests that he had union contacts or influence, albeit damaged contacts, even as an ex-offender.
 
 III.
 
 122
 For the foregoing reasons, we reverse the conviction of defendant Schwartz and affirm the convictions of defendants Collins, Fitzsimmons and Towne.
 
 
 
 *
 The Honorable James H. Jarvis, United States District Judge for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 Towne's arguments mirror Fitzsimmons' arguments. The analysis for Towne differs only slightly because he was acquitted of the substantive RICO offense. Like Fitzsimmons, however, he contends the jury instruction permitted the jury to rely on an act which is not an offense in convicting him of the conspiracy charge. The interpretation and effect of the jury instruction and the grant of Rule 34 arrest of judgment is central to both their assignments of error
 
 
 [2]
 To be convicted of conspiracy to commit RICO, the defendant must have "agreed to join a racketeering enterprise and [have] agreed to the commission of any two of the various predicate acts charged in the indictment." Callanan v. United States, 881 F.2d 229 (6th Cir.1989) (citing United States v. Joseph, 781 F.2d 549, 554 (6th Cir.1986)), cert. denied, 110 S.Ct. 1816 (1990)